# IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### BALTIMORE DIVISION

| | |
|---|---|
| **TIMOTHY AND BERNADETTE LLOYD**<br>10229 Peanut Mill Drive,<br>Gaithersburg, MD 20882-4027 | * <br> * <br> * <br> * |
| **MARY DEVINE**<br>12629 Black Saddle Lane,<br>Germantown, MD 20874 | * <br> * <br> * <br> * |
| **KATHERINE F. WILSON**<br>2301 Greenery Lane, #104,<br>Silver Spring, MD 20906 | * <br> * <br> * <br> * |
| **JOAN AND JOHN CANTERBURY**<br>8625 Emory Grove Road,<br>Gaithersburg, MD 20877 | * <br> * <br> * <br> * |
| **THOMAS DILLINGHAM**<br>17100 Butler Road,<br>Poolesville, MD 20837-2227 | * <br> * <br> * <br> * |
| **SCOTT ORBACH**<br>6931 Arlington Road<br>Bethesda, MD 20824 | * <br> * <br> * <br> * |
| **SHELON BAIRD**<br>9830 Fire Tower Road<br>Ijamsville, MD 21754 | * <br> * <br> * <br> * |
| **MARK AND MELANIE HARRIS**<br>4309 Sandy Spring Road<br>Burtonsville, MD 20866 | * <br> * <br> * |
| **MARGARET V. HARRIS**<br>4309 Sandy Spring Road<br>Burtonsville, MD 20866 | * <br> * <br> * <br> * |
| **REBECCA AND WILLIAM SNYDER**<br>13830 Bronco Place<br>Germantown, MD 20874 | * <br> * <br> * <br> * |
| **ERIC ULDER**<br>11140 Rockville Pike | * <br> * |

**Case No. BEL-07-2487**
**Fifth Amended Complaint**
**Jury Trial Demanded**

#810                                          *
Rockville, MD 20850                           *
                                              *
    And                  *
                                              *
**GM Vehicle Owners 1 to 100**               *
                                              *
    And                  *
                                              *
**Ford Vehicle Owners 1 to 100**             *
                                              *
    And                  *
                                              *
**Chrysler Vehicle Owners 1 to 100**         *
                                              *
    And                  *
                                              *
**Saturn Vehicle Owners 1 to 100**           *
                                              *
    Individually, and on behalf of all others *
    similarly situated,   *
                                              *
    Plaintiffs           *
                                              *
    v.                   *
                                              *
**General Motors Corporation,** *et al.*     *
                                              *
                                              *
    Defendants            *
                                              *
                                              *
                                              *
                                              *
                                              *
                                              *
                                              *
                                              *
                                              *
                                              *
                                              *

## FIFTH AMENDED COMPLAINT

Plaintiffs, Timothy and Bernadette Lloyd, Mary Devine, Katherine F. Wilson, Joan and Joan Canterbury, Shelon Baird, Thomas Dillingham, Scott Orbach, Melanie and Mark Harris, Margaret V. Harris, Rebecca and William Snyder, Eric Udler, GM Vehicle Owners 1 through 100, Ford Vehicle Owners 1 through 100, Chrysler Vehicle Owners 1 through 100, and Saturn Vehicle Owners 1 through 100, by and through their attorneys, Motley Rice LLC, John M. Mason, Esquire, The Law Offices of William F. Askinazi, Esquire, MBA, and Stephen H. Ring, P.C., file this Fifth Amended Complaint pursuant to Fed.R.Civ.P. 23 on behalf of themselves and all others similarly situated, against Defendants General Motors Corporation (hereinafter "GM"), Ford Motor Company (hereinafter "Ford"), Chrysler LLC (hereinafter "Chrysler") and Saturn corporation (hereinafter "Saturn"), and their successors in interest, and state as follows:

## I.    INTRODUCTION

1.    This class action centers on causes of action arising under Maryland common law and the Maryland Consumer Protection Act, CL § 13-301, et. seq. ("the CPA").   The Defendants' conduct that gives rise to these causes of action encompasses the design, testing, selection, manufacture, installation, assembly, marketing, supply, distribution and sales of Occupant Seating Systems in the Class Vehicles.

2.    At all times relevant to this action, Defendants negligently and carelessly designed, tested, selected, manufactured, installed, marketed, supplied, sold, distributed, and profited from sales of the identified Occupant Seating Systems, all of which contain the Defect.

3.     At all times relevant to this action Defendants and/or their agents, employees, subcontractors, and suppliers designed, tested, selected, manufactured, installed, marketed, supplied, sold, distributed, and profited from the identified front Occupant Seating Systems with the Defect, rendering them inherently dangerous and creating an unreasonable risk of serious injury or death to users.  The Occupant Seating Systems were in the same defective condition due to the Defect from the time they left Defendants' control until they reached the Class Members, all of whom used the Occupant Seating Systems in the manner intended by Defendants.

4.     At all times relevant to this action Defendants had a duty to disclose to and warn Plaintiffs and Class Members truthfully and accurately, and to not conceal or misrepresent such truth, about the Defect. Notwithstanding this duty, and in violation thereof, Defendants carelessly and negligently failed to disclose to and warn Plaintiffs and Class Members, and concealed and misrepresented the truth, about the Defect.

5.     At all times relevant to this action, Defendants fraudulently concealed and intentionally failed to warn Plaintiffs and Class Members of the Defect with the intent to deceive them into purchasing Class Vehicles without knowledge of the Defect. Defendants falsely and fraudulently represented to Plaintiffs and Class Members that their Class Vehicles were reasonably crashworthy and safe for normal and intended use, when in fact their Class Vehicles were not.

6.     At all times relevant to this action, Defendants have willfully, knowingly, and/or recklessly committed unfair or deceptive acts or practices in Maryland for the express unlawful purpose of wrongfully concealing the Defect and their knowledge of it in violation of CL §13-301, et. seq.

7.    At all times relevant to this action, Defendants conspired among themselves and with others to conceal from the public, from Plaintiffs and from the Class Members, the following: a) the Defect; b) efforts to eliminate the Defect, c) efforts to persuade regulatory authorities to refrain from enacting regulations that would have required stricter safety requirements for automobile Occupant Seating Systems, d) efforts to understate or misrepresent the nature of the risk created by the Defect, e) efforts to avoid the use of safer seat design in order to save minimal costs, with full knowledge of the fact that consumers would be thereby unreasonably exposed to serious injury or death.

8.    Plaintiffs did not know, and by the exercise of reasonable diligence could not have known (1) of all the conduct constituting common law negligence and reckless conduct and violation of the CPA, (2) that they had been injured by this unlawful conduct, and (3) the entities responsible for the unlawful conduct.

9.    The allegations in the Fourth Amended Complaint are incorporated by reference. Specifically, Plaintiffs incorporate the Fourth Amended Complaint's incorporation of all allegations and exhibits contained in the previous Third, Second, and First Amended Complaints, as well as the initial Complaint, including but not limited to Exhibit A of the Third Amended Complaint (a three-page table titled "List of Class Vehicles – Lloyd v. GM et al. Rev. 11/11/99") and its non-exclusive definition of "Class Vehicles," which Exhibit A is attached hereto.

## II.    PARTIES

### A.    Representative Plaintiffs

10.    Plaintiffs TIMOTHY AND BERNADETTE LLOYD (hereinafter "Lloyd") are husband and wife residing in Montgomery County, Maryland, and at the time this suit

was initiated, owned a 1995 Saturn, and presently own a 1997 Dodge Caravan designed, manufactured, assembled, marketed, distributed and sold by Defendant Chrysler.

11.     Plaintiff **MARY DEVINE** is a resident of Montgomery County, Maryland and owns a 1996 Dodge Neon designed, manufactured, assembled, marketed, distributed and sold by Defendant Chrysler.

12.     Plaintiff **KATHERINE F. WILSON** is a resident of Montgomery County, Maryland and owns a 1995 Chevrolet Cavalier designed, manufactured, assembled, marketed, distributed and sold by Defendant GM.

13.     Plaintiffs **JOAN AND JOHN CANTERBURY** (hereinafter "Canterbury") are husband and wife residing in Montgomery County, Maryland and own a 1996 Chevrolet Silverado designed, manufactured, assembled, marketed, distributed and sold by Defendant GM.

14.     Plaintiff **THOMAS DILLINGHAM** is a resident of Montgomery County, Maryland and owns a 1998 Ford Explorer designed, manufactured, assembled, marketed, distributed and sold by Defendant Ford.

15.     Plaintiff **SCOTT ORBACH** is a resident of Montgomery County, Maryland and owns a 1999 Chrysler minivan designed, manufactured, assembled, marketed, distributed and sold by Defendant Chrysler.

16.     Plaintiff **SHELON BAIRD** is a resident of Frederick County, Maryland and owns a 1998 Dodge Neon designed, manufactured, assembled, marketed, distributed and sold by Defendant Chrysler.

17.     Plaintiffs **MARK AND MELANIE HARRIS** (hereinafter "Harris") are a husband and wife residing in Montgomery County, Maryland and own a 1996 Jeep Grand

Cherokee designed, manufactured, assembled, marketed, distributed and sold by Defendant Chrysler.

18. Plaintiff **MARGARET HARRIS** is a resident of Montgomery County, Maryland and owns a 1996 Ford Thunderbird designed, manufactured, assembled, marketed, distributed and sold by Defendant Ford.

19. Plaintiffs **WILLIAM AND REBECCA SNYDER** (hereinafter "Snyder") are husband and wife residing in Montgomery County, Maryland and own a 2000 Saturn designed, manufactured, assembled, marketed, distributed and sold by Defendant Saturn.

20. Plaintiff **ERIC UDLER** is a resident of Montgomery County, Maryland and owns a 1995 Buick Riviera designed, manufactured, assembled, marketed, distributed and sold by Defendant GM.

21. **GM VEHICLE OWNERS 1 THROUGH 100** are Maryland residents who own Class Vehicles designed, manufactured, assembled, marketed, distributed and sold by Defendant GM, and are members of the Class.

22. **FORD VEHICLE OWNERS 1 THROUGH 100** are Maryland residents who own Class Vehicles designed, manufactured, assembled, marketed, distributed and sold by Defendant Ford, and are members of the Class.

23. **CHRYSLER VEHICLE OWNERS 1 THROUGH 100** are Maryland residents who own Class Vehicles designed, manufactured, assembled, marketed, distributed and sold by Defendant Chrysler, and are members of the Class.

24. **SATURN VEHICLE OWNERS 1 THROUGH 100** are Maryland residents who own Class Vehicles designed, manufactured, assembled, marketed, distributed and sold by Defendant Saturn, and are members of the Class.

**B.     Defendants**

25.     **GM** is a Delaware corporation having its principal place of business in Detroit, Michigan.

26.     **FORD** is a Delaware corporation having its principal place of business in Detroit, Michigan.

27.     **CHRYSLER** is a Delaware corporation having its principal place of business in Auburn Hills, Michigan.

28.     **SATURN** is a Delaware corporation having its principal place of business in Detroit, Michigan.

29.     Defendants design, test, select, manufacture, install, assemble, market, supply, distribute, sell and profit from sales of Occupant Safety Systems in motor vehicles.

## III.     <u>JURISDICTION AND VENUE</u>

30.     At all times relevant to this action Defendants have been engaged in a regular course of business in Montgomery County, Maryland.

31.     This Court has jurisdiction under 28 U.S.C.A. § 1332 and the Class Action Fairness Act of 2005.

32.     Venue is proper under 28 U.S.C.A. §§ 100 and 1441(a), subsequent to the removal of this action by the Defendants.

## IV.     <u>DEFINITIONS</u>

33.     "Class Vehicle" means (i) all vehicles listed in the attached Exhibit A, and (ii) the following groups of Defendants' makes and models of motor vehicles, having the same or substantially similar Occupant Seating Systems within each defendant group:

        a)  Ford Subclass Vehicles, consisting of all motor vehicles containing the

same seats as the 1991- 2001 Ford Explorer, the 1997 through 2001 Mercury Mountaineer, the 1991 – 1994 Mazda Navajo, and the Ford MN12 platform, including the 1989-1997 Ford Thunderbird and Mercury Cougar, manufactured by or for the Ford Motor Company; or containing substantially similar seats;

b)  GM Subclass Vehicles, consisting of all motor vehicles containing the same seats as the 1988 through 1996 GMC and Chevrolet C/K GMT 400 Platform Extended Cab Trucks; the 1995 through 1997 GMC Jimmy, the 1995 through 1997 Chevrolet Blazer; the 1995-2005 Chevrolet Cavalier; or containing substantially similar seats;

c)  Chrysler Subclass Vehicles, consisting of all motor vehicles containing the same seats as the 1991-1995 Chrysler, Dodge, and Plymouth "AS" platform minivans; the 1996-2000 Chrysler Town and Country, Dodge Caravan and Plymouth Voyager Minivans (the "NS" platform); the 2001-2007 RS Minivan platform vehicles featuring high back bucket seats; the 1994-2005 Dodge, Plymouth, and Chrysler  Neon; and the 1993-1998 Jeep Grand Cherokee; or containing substantially similar seats; and

d)  Saturn Subclass Vehicles, consisting of all motor vehicles containing the same seats as 1991 through 2002 SATURN S-Series cars, or containing substantially similar seats.

34.    The term "Class Vehicle" does not include any motor vehicle made by (i) a Defendant that incorporates a front seat design known in the trade as "all-belts-to-seat," or ABTS, or (ii) GM or Saturn that incorporates a front seat that is designed to comply

with GM's "vehicle subsystem technical specification" or "VTS," as that specification is set forth in GM's internal documents.

35.     "Occupant Seating System," means the complete driver and/or passenger front seat including all of its components, attaching hardware and structures in any of the "Class Vehicles."

36.     "Defect" means the inability of an Occupant Seating System to provide a reasonable degree of expected and intended occupant protection when positioned in a normal and routine upright position to withstand moderate collision impacts and accelerations without significant deformation or rearward collapse of the backrest which would create a substantial and unreasonable risk of personal injury or death to the occupant of the seat or any rear seat passengers.

37.     The term, "the Class," means all Maryland residents, including corporate entities, who own or lease a Class Vehicle, excluding  i) all persons or entities who have already commenced an individual civil action based on the product defects alleged in this suit; ii) all persons who have suffered personal injury as a result of the rearward collapse of a Seat; iii) the officers, directors, agents, controlled persons, servants or employees of Defendants, and of all entities which are a parent, subsidiary or affiliate of any of Defendants; and  iv) members of the immediate families of all persons covered in iii) above.

38.     "Class Member" means a person who is a member of the Class, and includes Plaintiffs named as class representatives.

## V.     CLASS ACTION ALLEGATIONS

39.     The members of the Class are so numerous that joinder of all members is

impractical.

40.     Each of the class representatives owns a Class Vehicle and is an appropriate representative of the Class.  The class representatives will fairly and adequately protect the interests of the Class, and have no interest that is contrary to or in conflict with those of the Class.  They have retained attorneys who are experienced and skilled in Class action litigation.  They assert claims herein that are typical of the claims of the Class, in that they and every Class member seek an award of compensatory damages measured by the reasonable cost of replacing or modifying the Occupant Seating Systems to render them crashworthy.

41.     Questions of fact and law predominate over any questions affecting only individual Class Members.  Common questions of fact include the following:

      a.   Whether the Defect creates a substantial and unreasonable risk of personal injury or death to Class Members.

      b.   Whether the Occupant Seating Systems are defective in design and/or manufacture.

      c.   Whether and when Defendants knew or should have known of the Defect.

      d.   Whether Defendants knew or should have known that the design and/or manufacture of the Occupant Seating Systems is uncrashworthy in creating an unnecessary and unreasonable risk that the occupied front Occupant Seating System would deform readily under moderate and foreseeable collision forces and accelerations acting on the seat which result in rearward collapse.

e.  Whether it has been shown by crash tests and research that the design and/or manufacture of the Occupant Seating Systems creates an unreasonable risk that the Occupant Seating System will deform readily under moderate and foreseeable collision forces and accelerations acting on the seat which result in rearward collapse.

f.  Whether Defendants knew or should have known that the design and/or manufacture of the Occupant Seating Systems creates an unreasonable risk that occupants of the vehicle in the front or back Occupant Seating Systems would be injured as a result of foreseeable rearward collapse of the Occupant Seating System following certain impacts to the vehicle.

g.  Whether the inclusion of a properly designed and manufactured recliner mechanism on both the inboard and outboard sides of the front Occupant Seating Systems of the Class Vehicles and other design enhancements to the overall Occupant Seating System is feasible and reasonably inexpensive in relation to the additional occupant protection that would result.

h.  Whether the number and type of reported and estimated instances of Occupant Seating System collapse suggests that the Occupant Seating System design creates an unreasonable risk of collapse.

i.  Whether Defendants have concealed from consumers a known risk of injury from the collapse of Occupant Seating Systems in Class Vehicles.

42.     Common questions of law include the following:

    a.   Whether Defendants' conduct as described herein constitutes tortious concealment, failure to warn, or misrepresentation.

    b.   Whether Defendants' conduct as described herein constitutes fraud.

    c.   Whether Defendants' conduct as described herein constituted, or was part of, a civil conspiracy.

    d.   Whether Defendants' conduct as described herein violated the Maryland Consumer Protection Act (CL §13-101et seq.).

    e.   Whether Defendants' conduct as described herein constitutes negligence.

    f.   Whether Defendants' conduct as described herein renders them liable in strict liability.

    g.   Whether retro-fitting the Occupant Seating Systems with safer Occupant Seating Systems or replacement of the Occupant Seating Systems is the most appropriate method to correct the Defect.

    h.   The amount of compensatory damages to which each Class Member is entitled.

43.     The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications that would establish inconsistent standards of conduct for Defendants.

44.     The prosecution of separate actions by the individual members of the Class would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of the other members not parties to those actions, or could substantially impair

or impede their ability to protect their interests.

45.     A class action is superior to other available means for the fair and efficient adjudication of the claims presented by this Complaint. This forum is appropriate for the litigation of the claims of the entire Class. The certification criteria of Fed R. Civ. P. 23 are met, and certification of the above-defined Class is appropriate.

## VI.     ALLEGATIONS OF FACT

### Risk of Severe Injury or Death

46.     Each year thousands of Maryland residents die and/or suffer serious injuries in certain collisions involving motor vehicle accidents many of which are rear-impacts or other impacts.

47.     In 1992 GM reported that over 23% of all automobile injuries are related to rear-impact crashes; that the most severe injuries are usually associated with large changes in velocity of the struck vehicle, seatback deflection, and head impact; and that the possible consequence of cervical injury causing quadriplegia or paraplegia is of concern in the effort to prevent injury and improve the protection of passenger car occupants. [Viano, 1992]

48.     The Defect has resulted in significant numbers of serious injuries including paraplegia, quadriplegia and death to occupants of Class Vehicles struck in rear-impact collisions.

49.     There are more than 200,000 Class Vehicles in operation in Maryland.

50.     All Occupant Seating Systems have the Defect.

51.     It is highly predictable that a certain percentage of occupants of Class Vehicles will be killed or seriously injured in rear-impact motor vehicle collisions each

year in the U.S., and that some of those killed or injured will be Class Members.

### Automobile Occupant Seating System as a Safety Device

52.     The automobile Occupant Seating System is the single most important life-saving device in an automobile in the event of a crash.

53.     In 1966 GM engineers recognized that the safety of front seat occupants in rear-impact collisions is largely dependent on a front seat structure that will maintain the occupant in an upright seated position.

54.     Defendants have known for over 30 years that the failure of seatback stiffness strongly influences occupant injury in a rear-impact and other types of collisions; that rear seat occupants have been killed and/or seriously injured by the front seat collapsing onto them; and that Occupant Seating System design should aim at minimizing occupant "ramp-up" and "rebound" while containing seatback rotation.

55.     Because rear-impact collisions are common, they cause significant human suffering and high societal costs as do other types of injury causing collisions where Occupant Seating Systems fail. [EASi 1997, p. 22]

### Weakness of the Occupant Seating Systems

56.     The Occupant Seating Systems are unreasonably unsafe in moderate and severe rear-impact and other collisions forces and accelerations because they are so weak they deform and/or collapse rearward, allowing the occupant to slide or ramp-up the seatback and suffer hyperextension of the spine over the top of the Seat, or to be hurled into the rear seat area.  The latter event can result in injuries not only to the occupant who is hurled back, but also to those already seated in the rear of the vehicle, including children in safety Occupant Seating Systems positioned as recommended by the

manufacturer.  Additional hazards caused by Seat collapses include: 1) the loss of vehicle control when the driver is unable to reach pedals or hand controls, and 2) delayed escape from the vehicle in the event of fire.   3) loss of restraint effectiveness for subsequent collisions

57.     Crash tests and research demonstrate that seat designs and other design flaws create an unreasonable risk of increased harm to occupants. [Molino, 1997]

58.     In 1968, the head of GM's Oldsmobile Division recommended to GM executives that seatback strength should be increased, and stated that it was "well within the range of early possibility to provide survivability in 60 mph rear-end impacts" with strong Occupant Seating Systems and head restraints. He presented movies and test data showing that a stiffer seat was safer for the occupant in a rear-impact crash.

### Thirty-year Industry Awareness of Defect

59.     GM, Ford and Chrysler have known the risk of injury associated with the Defect for over 30 years.  Saturn has known this risk since Saturn came into existence.

60.     As early as 1967 a widely recognized auto safety expert reported, "High speed impacts may force the front seat passenger up the plane of the backrest to whiplash him or break the seatback, releasing him to the rear seat area or even out the rear door, notwithstanding the use of a seatbelt; neither of these extremes represents an acceptable or satisfactory solution to a very serious and frequently occurring type of collision." [D. Severy et al, SAE 670458 "Collision Performance LM Safety Car," (1967).]

61.     Since 1967 auto industry publications have contained numerous articles by highly regarded engineers and safety professionals pointing out the features of Occupant Seating Systems that have been termed, the "Defect," in this pleading.

62.     Defendants have been criticized for the Defect by highly regarded auto safety engineers and other safety professionals, based on research and crash tests clearly demonstrating the Defect.  Defendants are aware of the evidence of the Defect, but nevertheless maintain a practice of not disclosing to potential customers any research data or information on the strength of the Occupant Seating Systems.

63.     Defendants are aware that preventable and foreseeable deaths and severe injuries have been caused by the Defect for the past 30 years.  This awareness comes from studies conducted by Defendants and others; from data collected by or for NHTSA as illustrated by Exhibit E attached to the original complaint; from specific reports of incidents; and from numerous lawsuits.

64.     In hundreds of instances Defendants have represented to government agencies, courts, juries and the public that their Occupant Seating Systems are designed to "yield" in rear-impact collisions.

65.     GM's own reports recognize the serious hazards posed by yielding Occupant Seating Systems. These reports cite quadriplegia, paraplegia and even death as potential injuries resulting from yielding Occupant Seating Systems.  The likelihood that this design would cause serious injury in the event of a rear-impact or other collision impact force is well documented. [Buongiovanni]

66.     In contrast with the thesis that GM designed its Occupant Seating Systems to yield in rear-impact collisions, a chief GM design engineer has testified that yielding was not a feature intended by the designers.

67.     In the early 1990's, in the wake of several national media reports alleging that Defendants Occupant Seating Systems were defectively designed and had caused serious

death or personal injury in rear-impact collisions, Defendants made important public statements in the course of "defending" these charges that they knew to be deceptive, misleading, and false, especially when measured against the knowledge of Defendants as set forth herein.

68.    Defendants stated falsely that with respect to occupant protection in rear-impact and other collision crashes involving their cars, occupants are reasonably and adequately protected and are as well or better protected in such impacts than in frontal or side crashes.

69.    Defendants stated falsely that the automotive engineering experts were generally of the opinion that yielding or deforming seatbacks are beneficial for virtually all occupants in rear-impact crashes, and that seatbacks that did not deform or yield have a greater potential to increase occupant injury in such crashes.

70.    Defendants stated falsely that their cars' front seatbacks were all reasonably crashworthy in rear-impact crashes because the seatback strength was designed to be approximately twice the strength required by the federal government.

### *The 30-year Cover-up*

71.    GM has approached seat safety in two ways: Outwardly, GM denied there was any problem with the strength of its seat backrests and promoted a standard that it knew was unreasonably unsafe.  Internally, GM conducted research that showed that strong Occupant Seating Systems were a major factor in the survivability of occupants in rear-impact collisions, and that its Occupant Seating Systems were unreasonably unsafe. GM concealed its damaging research from the government and the public, and carried on this duplicity for over 30 years.  Only through litigation, after lengthy discovery battles in

other suits, has the truth been exposed.

72.     Ford and Chrysler (as well as their outside experts) worked in concert with GM to perpetuate the myth of the safe yielding seat, and to conceal the truth known to all three of them that rigid Occupant Seating Systems protect occupant safety. Saturn, which came into existence in the 1990's, embraced the same party line and concealed the truth as well.

73.     In the late 1960's the National Highway Safety Board (a precursor of the current National Highway Safety Transportation Administration, or "NHTSA") began operations and invited input from the auto industry on the development of safety regulations for automotive design.

74.     In 1968 GM engineers conducted studies and crash tests, and determined that serious personal injuries were likely to result from existing seat designs, and that stronger Occupant Seating Systems were necessary to withstand rear-impact collisions.   This legitimate research was presented to GM executives, who chose to hide it and to argue outside GM in favor of a lenient standard that would be easy to satisfy. [Skeela; Kehrl]

75.     In 1968, NHTSA essentially adopted the lenient standard GM had recommended, as a temporary measure until new standards could be implemented through the rule-making process.

76.     In 1989 Alan Cantor, a well-known safety expert in the auto industry and engineer, petitioned NHTSA for rulemaking to amend the federal safety standard for seatback strength, pointing out that the importance of seat rigidity in rear-impact collisions has been common knowledge in the industry for many years.

77.     By 1971 the NHSB had developed a set of proposed automotive safety

regulations, including safer standards for seat backrest strength, that were about to be submitted for approval.

78.     While the proposed regulations were awaiting agency approval, GM and Ford communicated with each other and developed a plan to impede the implementation of the new regulations.

79.     On April 27, 1971, President Richard M. Nixon met with Henry Ford II, Lee Iacocca (who at that time was an executive with **FORD)**, and White House chief aide John Ehrlichman in the Oval Office at the White House.  During that meeting, Mr. Iacocca told the president, ". . . safety has really killed all of our business . . ." [National Archives tr. Nov. 10, 1982 at page 16.]  Mr. Iacocca and Mr. Ford asked the president to impede the implementation of the proposed regulations, and the president agreed.

80.     On May 13, 1971, President Nixon met with James M. Roche, chairman of GM, in the Oval Office.   At that meeting, Mr. Roche requested a delay in the implementation of the safety regulations.   President Nixon commented that similar concerns had been expressed to him by Ford, and that he would see that implementation of the new regulations was quietly delayed. [President Nixon's Daily Diary, May 13, 1971]

81.     As a result of these meetings in the Oval Office the implementation of the safety standards, including those affecting seat strength, did not take place in 1971.  The current federal safety standard for auto seat backrest strength has remained essentially unchanged since 1971.

82.     Defendants have continued for at least 30 years to exert political and economic pressure wherever possible to prevent the implementation of any seat

regulations more demanding than those originally adopted by NHTSA.

83.   In 1981, GM, Ford and Chrysler urged NHTSA to stop conducting rear-impact crash tests. NHTSA complied, suspending most or all of such tests in 1981. NHTSA resumed rear-impact crash testing in 1995 after urging by two well-known auto safety experts.

84.   While outwardly advocating Occupant Seating Systems that deflect or yield, GM came to the realization in 1990-92 that it would in fact need to improve seat strength. Reasoning that a special program would tend to damn those Occupant Seating Systems currently in the field, GM planned to phase in a stronger seat over a period of ten or more years.  The new seat design would be combined with other design changes, so it would not stand out as a separate project aimed at a specific problem that GM felt needed fixing. [Hoffman, 1992]

85.   In 1972 Ford developed proposed safety features for its 1973 passenger cars, and reported that front seat system improvements sufficient to withstand a 30 mph crash test featuring a "2-door front seat latch" would have an "Average Base Car Design Cost" of $.30 per vehicle, with the exception of the Thunderbird/Mark III, for which the cost would be $.50 per vehicle.

86.   In 1995 GM determined that stronger, safer Occupant Seating Systems could be manufactured at a cost of less than $1.00 per vehicle while adding less than eight ounces (2 lb.) of weight to the vehicle.

*Platforms*

87.   In 1990 Lear Corporation and Johnson Control, Inc. began making most of Defendants' Occupant Seating Systems, based on sets of specifications known as

"platforms," each of which encompasses several models.   A given platform defines
certain basic structural and engineering features, such as frame, passenger compartment,
wheelbase, axle configuration, suspension, drivetrain, and floor plan.   A given GM
platform, for example the "W" platform, is utilized for several GM models, and typically
endures over several years. This platform approach is used by all Defendants for all of the
Class Vehicles.

88.     Minor design variations among Occupant Seating Systems, whether within a
given platform, across platforms, or across makes, are essentially irrelevant, as the Defect
is substantially the same in every Class Vehicle.

### *Coordination of Efforts*

89.     GM, Ford and Chrysler coordinated their efforts, shared information and
planned together to oppose the implementation of any reasonable standard for seat
backrest strength.   Consistent with this effort, Defendants went three decades without
strengthening the seat backrests in most of their vehicles. [Warner; Strother #912914 at p.
385]

90.     In 1992 the television program, "60 Minutes" aired a story on auto seat
failures.   This prompted Ford to start a project code-named, "Straw-Dog," to develop
defenses against claims based on seat failures.   Straw Dog was coordinated with similar
projects by GM and Chrysler.

91.     In 1993, while it was aware that moving barrier tests were more realistic and
accurate than static tests for assessment of seat integrity in rear-impact collisions, Ford
recommended static tests to NHTSA. As a result of collusion with GM, and while aware
of the falsity of its position, Ford argued to NHTSA that a yielding seat was preferable to

a rigid seat for purposes of occupant protection.

92.     Defendants agreed and conspired among themselves to share and coordinate their knowledge, data, research activity, and decisions respecting the design and testing of seatbacks.  For example, internal communications in 1992 among members of Ford's internal Seat Back Task Force investigating Ford's yielding front seatbacks refer to the desirability of using the auto industry's Crash Dummy Consortium, which included all Defendants, to ensure such coordination among Defendants. One such communication noted that it "would be worse than silly" for Ford's Seat Back Task Force to be "going in one direction" regarding front seatback design and for the auto industry's industry-wide research program on this subject to be going in a "conflicting direction" with Ford not know[ing] it."

93.     The purpose and intended effect of Defendants' conspiracy and the overt acts in furtherance thereof have been to stabilize, suppress, and block competition among Defendants in designing, manufacturing, and selling reasonably crashworthy front seatbacks for Defendants' 1990-1999 cars. Such a conspiracy in restraint of trade is per se illegal under federal and state antitrust laws. As a result of this conspiracy and its execution, the Class Vehicles are defectively designed, are unreasonably dangerous and unsafe, and are not reasonably crashworthy, and the owners and consumers of such cars are substantially exposed to serious injury and death in the event of a rear-impact collision. For purposes of the foregoing allegations of conspiracy, Defendants GM and Saturn are treated as a single corporate entity.

### Safer Alternative Designs

94.     Defendants' competitors in the auto industry have voluntarily adopted safer

seat designs that far surpass the Occupant Seating Systems in their performance in rear and other collisions.

95.     Defendants have evaluated and priced the increased cost of safer Occupant Seating Systems, have compared this to the cost of defending suits and paying settlements and judgments resulting from claims arising from collapsing Occupant Seating Systems, and have rejected the safer designs.   Instead, Defendants have outwardly resisted any suggestion or requirement of stronger seat backrests, and have gone to great lengths to promote, defend and perpetuate their decades-old myths to support their flimsy Occupant Seating Systems.

96.     During the years 1971 through 1974 General Motors of Europe built the Opal Kadette with strong dual-recliner Occupant Seating Systems.  In 1979 and 1980 Ford built the Merkur with strong dual-recliner Occupant Seating Systems.  In 1970 GM built the Buick Regal with strong dual recliner Occupant Seating Systems.   In 1985-88 Chrysler built at least one model with strong dual recliner Occupant Seating Systems. During the 1970's most European vehicles were manufactured with dual recliner mechanisms, while most U.S. vehicles had SRM's.  Other similar and even in some case more advanced and safer technologies were available or patents existed to give notice of these safer alternative designs.

### Marketing: Concealment of Known Defect

97.     Despite Defendants' knowledge that the Occupant Seating Systems are unreasonably unsafe and that preventable injuries and death will result, they have continued to manufacture, maintain, market, distribute and sell Class Vehicles equipped with the Occupant Seating Systems.

98.    Defendants knowingly and intentionally concealed from the public, including Plaintiffs and the Class Members, the unreasonable risk of substantial injury or death from Seat collapses in Class Vehicles involved in rear-impact collisions.

99.    When they purchased their vehicles Plaintiffs and the Class Members were unaware of the Defect and the risks created by it as described above, and had no reason to suspect or inquire about the Defect.

100.    Had they been advised of the Defect and the risks created by it prior to purchase, Plaintiffs would have avoided purchasing a Class Vehicle.

101.    As a result of the Defect, Plaintiffs and the Class Members are at substantial and unreasonable risk of personal injury or death in the event of a rear-impact collision.

### Lack of Consumer Awareness of Defect

102.    In recent years Defendants have publicized the crashworthiness of frontal restraint systems, helping to create a general public understanding that properly designed seat belts and air bags provide reasonable protection in frontal crashes by preventing the occupants from impacting the car's front interior surfaces, e.g. the steering column, dash, or windshield.  The safety objective of this restraint system is to maintain the occupant upright in the seat. In the event the restraint system fails, the occupant is exposed to substantial and unreasonable risk of serious injury or death.

103.    The same forces involved in a frontal crash work in the opposite direction against the front seat occupant when the car is hit from the rear, causing unrestrained occupants to ramp backward into the rear compartment, impacting rear interior surfaces and occupants.  Here, the restraint is provided by the seat, and in particular, the backrest. As with the frontal restraint system, the effectiveness of the rearward restraint system

depends largely on maintaining the occupant in an upright position.

104.   In contrast with frontal restraint systems, Defendants have done little to publicize information on rearward restraint systems, other than the aesthetics or comfort of car Occupant Seating Systems. As a consequence, and due also to the lack of widely available public information on auto Occupant Seating System failures, the public, Plaintiffs and the Class Members remained unaware of the substantial and unreasonable risk of serious injury or death created by the Defect.

105.   With no obvious reason to inquire or to research the issue, Plaintiffs and the Class Members have had no reasonable opportunity to base their buying decisions on the strength or safety of the Occupant Seating Systems.

106.   Exhibits A through F attached to the First Amended Complaint are hereby incorporated by reference.

107.   Defendants planned, collaborated in, assisted in, and ratified all of the acts and omissions alleged herein.  At all times relevant to this action Defendants acted as agents for each other.

## COUNT I - Negligence

108.   The allegations in the preceding paragraphs are hereby incorporated. by reference.

109.   At all times relevant to this action Defendants had the duty to exercise that degree of care that a reasonably prudent automobile manufacturer should use in the design, testing, selection, manufacture, installation, assembly, marketing, supply, distribution and sales of Occupant Safety Systems.  Notwithstanding this duty, and in violation thereof, Defendants negligently and carelessly designed, tested, selected,

manufactured, installed, assembled, marketed, supplied, distributed and sold Occupant Safety Systems in the Class Vehicles, creating the Defect. As a direct and proximate result of this breach of duty, occupants are exposed to a substantial, clear, and unreasonable risk of serious injury or death.

110.    WHEREFORE, Plaintiffs, individually and on behalf of the Class Members, seek judgment against Defendants for compensatory damages measured by the cost of correcting the Defect.

## COUNT II
### Strict Liability In Tort --- Restatement (Second) of Torts § 402A

111.    The allegations in the preceding paragraphs are hereby incorporated by reference.

112.    Defendants designed the Occupant Seating Systems with the Defect, rendering them inherently dangerous and creating a substantial, clear, extreme and unreasonable risk of serious injury or death to users. Defendants manufactured, assembled, marketed, distributed and sold the Occupant Seating Systems with the Defect. The Occupant Seating Systems were in the same defective condition due to the Defect from the time they left Defendants' control until they reached the Class Members, all of whom used the Occupant Seating Systems in the manner intended by Defendants.

113.    The Occupant Seating Systems were sold in substantial and unreasonably dangerous condition to an extent beyond that which would be contemplated by the ordinary consumer who purchased it.

114.    As a direct and proximate result of the facts alleged above, Plaintiffs and Class Members are exposed to a clear, substantial, an unreasonable risk of serious injury or death from the Defect and the Occupant Seating Systems.

115.    Defendants are strictly liable in tort for all injuries, damages and losses that have or may result from the collapse of a Seat in a Class Vehicle, and for the cost of rendering Class Vehicles safe.

116.    WHEREFORE, Plaintiffs, individually and on behalf of the Class Members, seek judgment against Defendants for compensatory damages measured by the cost of correcting the Defect.

**COUNT III**
**Negligent Failure to Disclose, Failure to Warn, Concealment and**
**Misrepresentation**

117.    Plaintiffs The allegations in the preceding paragraphs are hereby incorporated by reference.

118.    Defendants at all times relevant had a duty to disclose to and warn Plaintiffs and Class Members truthfully and accurately, and to not conceal or misrepresent such truth, about the Defect.

119.    Notwithstanding this duty, and in violation thereof, Defendants carelessly and negligently failed to disclose to and warn Plaintiffs and Class Members, and concealed and misrepresented the truth, about the Defect which posed a clear, substantial and unreasonable risk of risk of personal injury and death.

120.    Because Plaintiffs and Class Members did not have an equal opportunity to discover such truth about Defendants' defectively designed cars and Occupant Seating Systems, Plaintiffs and Class Members purchased Class Vehicles in the reasonable, but, unbeknownst to them, false belief they were fit for use, merchantable, and reasonably safe for their intended purposes.

121.    Because the Class Vehicles were not in fact fit for use, merchantable, and reasonably safe for their intended purposes, and because of Defendants' negligent failure to disclose and warn and their concealment and misrepresentation of such facts, as a direct and proximate result Plaintiffs and Class Members have been exposed to a substantial and unreasonable risk of serious personal injury or death in their normal use of their Class Vehicles.

WHEREFORE, Plaintiffs, individually and on behalf of the Class Members, seek judgment against Defendants for compensatory damages measured by the cost of correcting the Defect.

## COUNT IV
### Fraudulent Concealment and Intentional Failure to Warn

122.    The allegations in the preceding paragraphs are hereby incorporated by reference.

123.    Defendants fraudulently concealed and intentionally failed to warn Plaintiffs and Class Members of the Defect with the intent to deceive Plaintiffs and Class Members into purchasing Class Vehicles without knowledge of the Defect that posed a direct, substantial and unreasonable risk of risk of personal injury and death

124.    Defendants falsely and fraudulently represented to Plaintiffs and Class Members that their Class Vehicles were reasonably crashworthy and safe for normal use.

125.    Plaintiffs and Class Members reasonably and justifiably relied on Defendants' false and fraudulent representations, and on Defendants' deliberate silence, concerning the highly significant and material fact that the Class Vehicles were not reasonably crashworthy and were not safe for normal use, as a result of which, to their detriment, they elected purchase and operate Class Vehicles without knowledge of such fact. There

were no reasonable means for Plaintiffs or Class Members to make themselves aware of such fact, since Defendants have retained tight control of the relevant information concerning the Defect.

126.    As a direct and proximate result of Defendants' fraudulent conduct, of both commission and omission, Plaintiffs and Class Members have been and remain exposed to a substantial and unreasonable risk of serious injury or death during their normal use of their Class Cars.

WHEREFORE, Plaintiffs, individually and on behalf of the Class Members, seek judgment against Defendants for compensatory damages measured by the cost of correcting the Defect.

## COUNT V
### Unfair or Deceptive Trade Practices,
### Maryland Consumer Protection Act (CL § 13-301 et. seq.)

127.    The allegations in the preceding paragraphs are hereby incorporated by reference.

128.    The Class Members are consumers within the meaning of the Maryland Consumer Protection Statute, CL ' 13-301, et seq. ("the CPA").

129.    The Class Vehicles are consumer goods within the meaning of the CPA.

130.    Defendants engaged in fraudulent and deceptive conduct in the marketing and sale of Class Vehicles tending to deceive or mislead consumers including the Class Members.

131.    Defendants made oral and written statements that had the capacity, tendency or effect of deceiving or misleading consumers including Plaintiffs and the Class Members.

132. Defendants concealed and failed to state material facts, including the existence of the Defect, and this failure deceived or tended to deceive consumers including Plaintiffs and the Class Members.

133. Defendants engaged in deception, fraud, misrepresentation, knowing concealment, suppression, and the omission of material facts, with the intent that consumers including the Class Members would rely on the same, in connection with Defendants' promotion and sale of Class Vehicles.

134. As a direct and proximate result of Defendants' conduct the Class Members elected to purchase, retain and operate Class Vehicles, exposing them to an unreasonable risk of serious injury or death during the normal use of their Class Vehicles.

135. Retention of the Class Vehicles by the Class Members constitutes an actual, cognizable loss under the Maryland Consumer Protection Act.

WHEREFORE, Plaintiffs, individually and on behalf of the Class Members, seek judgment against Defendants for compensatory damages measured by the cost of correcting the Defect, as well as all recoverable attorneys' fees, costs and expenses and punitive and treble damages as are appropriate.

## COUNT VI -Civil Conspiracy

136. The allegations in the preceding paragraphs are hereby incorporated by reference. Defendants conspired among themselves and with others to:

    a. Conceal the Defect from the public, from Plaintiffs and from the Class Members.

    b. Conceal from the public, Plaintiffs and the Class Members information that would support efforts to eliminate the Defect.

    c.  Persuade regulatory authorities to refrain from enacting regulations that would require stricter safety requirements for automobile Occupant Seating Systems.

    d.  Understate or misrepresent the nature of the risk created by the Defect.

    e.  Avoid the use of safer seat design in order save minimal costs, with full knowledge of the fact that consumers would be thereby unreasonably exposed to serious injury or death.

137.   As a direct and proximate result of Defendants' conduct the Class Members elected to purchase, retain and operate Class Vehicles, exposing them to an unreasonable risk of serious injury or death during the normal use of their Class Vehicles.

138.   This retention by Class Members of Class Vehicles constitutes actual legal damage to the Class Members.

WHEREFORE, Plaintiffs, individually and on behalf of the Class Members, seek judgment against Defendants for compensatory damages measured by the cost of correcting the Defect.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the proposed Class seek compensatory damages against all Defendants for their conduct alleged herein.  Plaintiffs demand judgment against Defendants, jointly and severally, as follows:

1.  Compensatory damages for the cost of repair, replacement or modification of the Occupant Seating Systems to render them crashworthy;

2.  Prejudgment interest;

3.  Cost of investigation and suit;

4. Reasonable attorney's fees; and

5. Such other relief as the Court deems equitable and just.


_____/s/_____
William F. Askinazi, Esquire
**Law Offices of William F. Askinazi**
12504 Palatine Ct.
Potomac, MD 20854
301-983-5110
waskinazi@hotmail.com


_____
Stephen H. Ring, Esquire
**Stephen H. Ring, P.C.**
20300 Seneca Meadows Parkway, Suite 200
Germantown, MD 20876
Maryland Bar No. 04731764
301-540-8180
shring@usa.net


_____
John M. Mason, Esq.
19304 Mouth of Monocacy Road
Dickerson, MD 20842
202-577-3060
jackmason@wildblue.net


_____
William Narwold, Esquire
Kevin R. Dean, Esquire
Suzanne Klok, Esquire
Frederick Jekel, Esquire
Rhett Klok, Esquire
William T. Lacy, Esquire
**Motley Rice LLC**
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
843-216-9000

*Attorneys for Plaintiffs*

## JURY DEMAND

The Plaintiffs request a trial by jury as to all issues so triable.

_____/s/_____
William F. Askinazi, Esquire

**EXHIBIT ATTACHED TO FIFTH AMENDED COMPLAINT**

Exhibit A:     Three-page Table List of Class Vehicles – Lloyd v. GM et al.
               (Rev. 11/11/99)

Exhibit A

List of Class Vehicles - Lloyd v. GM et al.
Rev. 11/11/99

| Make | Model | Years Manufactured | Platform Designation |
|---|---|---|---|
| GENERAL MOTORS CORPORATION | | | |
| Buick | Regal | 1990-97 | W |
| | Skylark | 1990-97 | N |
| | Century | 1990-98 | A |
| | Riviera | 1990-98 | |
| | Electra | 1990 | |
| | Roadmaster | 1992-96 | B |
| | Park Avenue | 1991-96 | C |
| | LeSabre | 1990-98 | H |
| Cadillac | Eldorado | 1990-98 | E |
| | Seville | 1990-98 | K |
| | Brougham | 1990-92 | |
| | DeVille | 1990-98 | |
| | Sixty Special | 1992-93 | |
| | Fleetwood | 1990-96 | |
| Chevrolet | Beretta | 1990-96 | |
| | Corsica | 1990-96 | L |
| | Cavalier | 1990-98 | L |
| | Camaro | 1990-98 | F |
| | Celebrity | 1990 | A |
| | Caprice | 1991-96 | B |
| | Malibu | 1997-98 | |
| | Lumina | 1990-97 | W |
| | Astro | 1990-98 | |
| | Monte-Carlo | 1994-97 | W |
| | Lumina APV | 1990-96 | |
| | Venture | 1997-98 | |
| | Tahoe | 1995-98 | C/K |
| | S-10 Blazer | 1992-98 | S/T |
| | Tracker | 1998 | |
| GMC | Safari | 1990-98 | |
| | Yukon | 1992-98 | C/K |
| | Suburban | 1990-98 | C/K |
| | Jimmy | 1992-98 | S/T |
| Oldsmobile | Cutlass Calais | 1990-91 | N |
| | Cutlass | 1997-97 | W |
| | Intrigue | 1997-98 | |
| | Achieva | 1992-97 | N |
| | Cutlass Supreme | 1990-96 | W |
| | 88 Royale | 1990-98 | H |
| | Cutlass Ciera | 1990-96 | A |
| | Toronado | 1990-92 | E |
| | Aurora | 1994-98 | |
| | 98 Regency | 1990-96 | C |

Exhibit A                                         1

## List of Class Vehicles – Lloyd v. GM et al.
### Rev. 11/11/99

| | | | |
|---|---|---|---|
| | Acclaim | 1990-94 | |
| | Sundance | 1990-93 | |
| | Voyager | 1990-98 | |
| Jeep | Cherokee | 1990-98 | |
| | Grand Cherokee | 1993-98 | |
| | Wrangler | 1990-98 | |
| **FORD MOTOR COMPANY** | | | |
| Ford | Escort | 1990-98 | |
| | Festiva | 1990-93 | |
| | Mustang | 1990-98 | Fox |
| | Probe | 1990-97 | |
| | Tempo | 1990-94 | |
| | Taurus | 1990-98 | |
| | Thunderbird | 1990-97 | |
| | Crown Victoria (LTD) | 1990-98 | EN53 |
| | Aspire | 1994-97 | |
| | Bronco | 1994-96 | |
| | Contour | 1995-98 | |
| | Aerostar | 1990-97 | |
| | Windstar | 1994-98 | |
| | Explorer | 1992-98 | |
| | Expedition | 1997-98 | |
| Lincoln | Continental | 1990-98 | |
| | Mark VII | 1990-92 | |
| | Mark VIII | 1993-98 | |
| | Town Car | 1990-98 | |
| | Navigator | 1997-98 | |
| Mercury | Tracer | 1990-98 | |
| | Topaz | 1990-94 | |
| | Cougar | 1990-98 | |
| | Capri | 1991-94 | |
| | Sable | 1990-98 | |
| | Mystique | 1995-98 | |
| | Grand Marquis | 1990-98 | EN53 |
| | Mountaineer | 1997-98 | |

3

List of Class Vehicles - Lloyd v. GM et al.
Rev. 11/11/99

|  |  |  |  |
|---|---|---|---|
|  | Silhouette | 1990-98 |  |
|  | Bravada | 1992-98 | S/T |
| Pontiac | Lemans | 1990-93 |  |
|  | Grand Am | 1990-98 | N |
|  | Sunbird | 1990-98 | N |
|  | Grand Prix | 1990-97 | W |
|  | Firebird | 1990-98 | F |
|  | 6000 | 1990-91 | A |
|  | Bonneville | 1990-98 | H |
|  | Trans Sport | 1992-98 |  |
| Saturn | Sedan | 1992-98 |  |
|  | SC | 1993-98 |  |
| Geo | Prizm | 1990-97 |  |
|  | Storm | 1990-93 |  |
|  | Metro | 1990-97 |  |
|  | Tracker | 1991-97 |  |
| CHRYSLER CORPORATION |  |  |  |
| Chrysler | New Yorker | 1990-93 |  |
|  | LeBaron | 1990-95 |  |
|  | Imperial | 1990-93 |  |
|  | Concorde | 1993-98 |  |
|  | LHS/New Yorker | 1994-98 |  |
|  | Cirrus | 1995-98 |  |
|  | Sebring coupe | 1995-98 |  |
|  | Town & Country | 1992-98 |  |
| Dodge | Colt | 1990-94 |  |
|  | Omni | 1990 |  |
|  | Daytona | 1990-93 |  |
|  | Shadow | 1990-93 |  |
|  | Stealth | 1991-95 |  |
|  | Spirit | 1990-94 |  |
|  | Dynasty | 1990-93 |  |
|  | Monaco | 1990-92 |  |
|  | Intrepid | 1993-98 |  |
|  | Neon | 1994-98 |  |
|  | Stratus | 1995-98 |  |
|  | Avenger | 1995-98 |  |
|  | Caravan | 1990-98 |  |
| Eagle | Summit | 1990-96 |  |
|  | Premier | 1990-92 |  |
|  | Talon | 1990-98 |  |
|  | Vision | 1993-97 |  |
| Plymouth | Colt | 1990-94 |  |
|  | Breeze | 1996-98 |  |
|  | Horizon | 1990 |  |
|  | Laser | 1990-93 |  |