## TABLE OF CONTENTS

Table of Authorities .................................................................................................. ii

Introduction ........................................................................................................... 1

Factual Background ............................................................................................... 4

Argument ............................................................................................................. 10

Conclusion ........................................................................................................... 26

## TABLE OF AUTHORITIES

### CASES

*A.H. Robbins Co.*, 880 F.2d 709, 728 (4th Cir. 1989) ........................................5, 12

*Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 153 (1972)) .......................22

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615, 617, 623, 625 (1997) .............
...................................................................................................................5, 16, 17, 24

*Baby Neal v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994) ...............................................16

*Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1036 (4th Cir. 1997)
...........................................................................................................................23

*Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988)..................................................22

*Benway v. Res. Real Estate Servs., LLC*, 239 F.R.D. 419, 425-426 (D. Md. 2006)
....................................................................................................................14, 15, 16

*Carras v. Burns*, 516 F.2d 251, 257 (4th 1975).....................................................23

*Central Wesleyan College v. W.R. Grace & Co.*, 143 F.R.D. 177, 185, 628, 637, 640
D.S.C. 1992), *aff'd*, 6 F.3d 177 (4th Cir. 1993)........................................16, 25, 26

*Chisolm  v. TranSouth Fin. Corp.*, 184 F.R.D. 556, 565 (E.D. Va. 1999) ............17

*City P'ship Co. v. Jones Intercable, Inc.*, 213 F.R.D. 576, 582 (D. Colo. 2002) ..21

*Daffin v. Ford Motor Co.*, 458 F.3d 549, 554 (6th Cir. 2006)...............................15

*Deiter  v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006).............................13

*Edens v. Goodyear Tire & Rubber, Co.*, 858 F.2d 198, 206-07 (4th Cir. 1988) ...22

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164, 177-78 (1974) .................11, 25

*Emig v. Am. Tobacco Co.*, 184 F.R.D. 379, 385 (D. Kan. 1998)...........................17

*Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc.*, 254 F.R.D. 68, 76 (D.N.C. 2008)
...........................................................................................................................12

*General Telephone Co. v. E.E.O.C.*, 446 U.S. 318, 330 (1980) ............................12

*Gunnells v. Healthplan Servs.*, 348 F.3d 417, 424, 425, 426, 427-428, 433, 437 n.12, 459 (4th Cir. 2003).......................................................10, 11, 13, 14, 21, 23, 24, 25, 26

*Honda Motor Co., Inc. Dealerships Relations Litig.*, 979 F. Supp. 365, 367 (D. Md. 1997) ...............................................................................................................23

*Int'l Woodworkers of Am. v. Chesapeake Bay Plywood Corp.*, 659 F.2d 1259, 1267 (4th Cir. 1981) .......................................................................................................11

*Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 78 (D. Md. 1991) ...................12

*Lerch v. Citizens First Bancorp., Inc.*, 144 F.R.D. 247, 252 (D.N.J. 1992) ..........21

*Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146, 156 (4th Cir. 2001) .............11, 17

*Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 131 (2007) (quoting *Morris v. Osmose*, 340 Md. 519, 534-35 (1996)) ..........................................................................................2

*Mercedes-Benz Tele Aid Contract Litigation* ("*Mercedes*"), Civ. No. 07-2720 (DRD), MDL No. 1914, 2009 U.S. Dist. LEXIS 35595 , at *86-*87, *92, *95, *98, *99-*100,*101 (D.N.J. April 27, 2009) .............................................2, 3, 13, 22, 23, 26

*Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 556, 560 (D. Md. 2006) ..................................................................................................12, 13, 24, 25

*New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 28 (1st Cir. 2008) ..........................................................................................................................23

*Newsome v. Up-to-Date Laundry, Inc.*, 219 F.R.D. 356, 362 (D. Md. 2004) .......14

*Peoples v. Wendover Funding, Inc.*, 179 F.R.D. 492, 498 (D. Md. 1998) ............17

*Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 50 (1977) .......................................22

*Robinson v. Fountainhead Title Group Corp.*, 252 F.R.D. 275, 287-88 (D. Md. 2008) ..........................................................................................................................13

*Secretary of Labor v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986) .............14

*Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 372-73 (1966)).............................15

*Thomas v. Louisiana-Pacific Corp.*, 246 F.R.D. 505, 508 (D.S.C. 2007) (quoting *Kelley v. Norfolk & W. Ry. Co.*, 584 F.2d 34, 35 (4th Cir. 1978))....................................12

*Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 318, 319 (4th Cir. 2006)11, 17

*Twyman v. Rockville Housing Authority*, 99 F.R.D. 314, 323 (D. Md. 1983).......15

*Wellman v. Dickinson*, 79 F.R.D. 341, 347 (S.D. N.Y. 1978)...............................15

## OTHER AUTHORITIES

1 NEWBERG §3.01 at 3-4 to 3-5.......................................................................13, 14

1 NEWBERG §3.13 at 3-76 to 3-77..........................................................................13

7A WRIGHT, MILLER, & KANE, *supra*, §1780, at 572-73 ......................................28

Federal Motor Vehicle Safety Standard ("FMVSS") 207 ..............................7, 8, 9

Fed. R. Civ. P. 23(a), (b), (c) ........................................................................ passim

WRIGHT, MILLER, & KANE §1769.1 at 375.......................................................14, 15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

TIMOTHY AND BERNADETTE LLOYD, *et al.*,       \*

                                 \*

                       Plaintiffs  \*

      v.                          \*       Case No. BEL-07-2487

                                 \*

                                 \*

GENERAL MOTORS CORPORATION, *et al.*,   \*

                      Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), Plaintiffs, by and through their undersigned counsel, respectfully submit this Memorandum of Law in support of their Motion for Class Certification.

## INTRODUCTION

For years, Ford Motor Company ("Ford" or "Defendant") has knowingly designed, manufactured and sold cars (the "Class Vehicles") with defective Occupant Seating Systems (the "seating systems").[1]  All of the Class Vehicles exhibit the same or substantially the same defect:  their seating systems consistently collapse in moderate-speed collisions, and thus, fail to protect vehicle occupants (the "Defect").[2]  Ford has known of the Defect for years.  Instead of fixing the problem, however, Defendant Ford conspired with Chrysler and General Motors to conceal it from the consuming public

---

[1] Paragraph 39 of the Fifth Amended Complaint ("Complaint" or "Compl.") defines "Occupant Seating System" to include the seats of the driver and front passenger and all of their components.

[2] Prior to the hearing on Plaintiffs' motion, and with sufficient time for analysis by the Court and opposing counsel, Plaintiffs will circulate copies of demonstrative evidence that further support this motion, including but not limited to testing and other data referred to in the expert reports attached to this Memorandum.

because doing so was cheaper.[3]   As a result, each day large numbers of Maryland residents drive Class Vehicles and face a substantial risk of sustaining any number of serious, life-threatening injuries if and when their seating system collapses during a car accident.   Based on these facts, the Maryland Court of Appeals aptly recognized that consumers should not have to wait for tragedy to strike before they can remedy the Defect. *See Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 131 (2007) (quoting *Morris v. Osmose*, 340 Md. 519, 534-35 (1996)).

Plaintiffs brought this case as a class action on behalf of all Maryland residents to accomplish precisely that goal. Because the proposed Subclasses, defined *infra*, are each appropriate for class treatment under Federal Rules of Civil Procedure 23(a) and (b)(3), this Court should not hesitate to certify each Subclass. *In re Mercedes-Benz Tele Aid Contract Litigation* ("*Mercedes*"), Civ. No. 07-2720 (DRD), MDL No. 1914, 2009 U.S. Dist. LEXIS 35595 (D.N.J. April 27, 2009), illustrates why class adjudication is a superior way to litigate these claims.

In *Mercedes*, the court certified a nationwide Rule 23(b)(3) class of vehicle purchasers who claimed that the defendants made material misstatements and omissions concerning the emergency response system in their vehicles. *Id.* at *3-*4. The plaintiffs pursued common law unjust enrichment claims and claims under the New Jersey consumer protection statute. *Id.* The Court found that the potential class representatives' claims were typical because all class members were equally affected by the defendants' concealment of material information, and thus, "all suffered the same harm." *Id.* at *86.

---

[3]   Indeed, as Plaintiffs' expert Mr. Alan Cantor noted, "Ford engineers and experts bolster their testimony by explaining that their seats perform in a comparable manner to General Motors' seats. Likewise, General Motors' engineers and experts explain to juries that their seats perform comparably to Ford seats." *See* Report of Alan Cantor, Exhibit 1, at p. 19.

The court also found that common issues predominated because plaintiffs' claims turned on "the knowledge and actions of the company rather than those of the individual class members . . ." *Id.* at *92.   Finally, the court held the class adjudication was superior because requiring class members to individually pursue their claims "would effectively bar recovery by creating a situation in which the cost to each [p]laintiff . . . would exceed any potential recovery." *Id.* at *99.

The instant case is even more appropriate for class certification.   First, like *Mercedes*, the claims of the unnamed Class Member are not significant enough to justify individual litigation, and requiring such would effectively bar Plaintiffs achieving justice. Second, because this case is not a nationwide class and involves only Maryland residents, there is no complicated choice of law issue or potential manageability problem.   Third, like *Mercedes*, there are no complex damages issues because the proposed Class Members here are only seeking economic damages based on their receipt of something "less than [what] they paid for." *Id.* at *90.   Finally, each proposed Subclass squarely satisfies the requirements of Rules 23(a) and (b)(3):

- It is undisputed that each proposed Subclass consists of thousands of potential members that cannot practicably be joined;

- The Defect is uniform in all Class Vehicles and poses the same substantial risk of injury to every potential Class Member;

- Damages can easily be determined on a class-wide basis;

- The claims of each proposed Class Representative are the same as those of the potential Class Members, and thus, are typical; and

- The proposed Class Representatives and the undersigned counsel will adequately represent the interests of the proposed Class.

In short, Plaintiffs respectfully submit that this Court should grant Plaintiffs' Motion for Class Certification.

## FACTUAL BACKGROUND

### A.     The Class Definition and the Class Representatives

The proposed Class includes all Maryland residents who own a Class Vehicle. Class Vehicles include:   the Ford Explorer, model years 1991-2001; the Mercury Mountaineer, model years 1997-2001; and the Ford Windstar, model years 1995-2001.[4] Plaintiffs have divided the Class Vehicles into the following subclasses:

1. **Ford Subclass I:**  All Maryland residents that own Ford Explorers, model years 1991-2001, and/or Mercury Mountaineers, model years 1997 through 2001.

2. **Ford Subclass II:**  All Maryland residents that own Ford Windstars, model years 1995 through 2001.

*See* Fed. R. Civ. P. 23(c)(4)(B) ("a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly."). Each subclass specifically excludes:

> i) all persons or entities who have already commenced an individual civil action based on the product defects alleged in this suit; ii) all persons who have suffered personal injury as a result of the rearward collapse of a Seat; iii) the officers, directors, agents, controlled persons, servants, or employees of Defendants, and of all entities which are a parent, subsidiary or affiliate of any of Defendants; and iv) members of the immediate families of all persons covered in iii) above.

*See* Compl. at ¶ 41.  Plaintiffs seek certification of all claims (Counts I-VI) for each Subclass.[5]

---

[4] Since the Fifth Amended Complaint was filed, there have been changes to the class definition and the list of class representatives.  Consistent with this Court's February 2, 2009 Order, none of those changes expanded the definition of the class or the list of class representatives.  On April 16, 2009, Plaintiffs' Counsel in good faith sent Defendants a letter reflecting the changes in the Fifth Amended Complaint.  A copy of that letter is attached Exhibit 1A.

[5] Plaintiffs submit that all counts can be certified.  If, however, this Court determines that any individual claim prevents certification, it should nonetheless certify the Subclasses as to the remaining claims.  "[I]f an action includes multiple claims, one or more of which might qualify as a certifiable class claim, the

While the precise number of Class Vehicles within the State of Maryland is unknown at this time, Plaintiffs have obtained data from an independent company that provides market information to the automotive industry. *See* Affidavit of William Taylor Lacy ("Lacy Aff.") ¶ 3, attached as Exhibit 2. Based on this data, as of 2009, there were approximately 68,404 Class Vehicles in Maryland. Lacy Aff. ¶ ¶ 5-8. The following chart provides the numbers by Subclasses:

| Subclass | Model Years | Total |
|----------|-------------|-------|
| Ford Subclass I | 1991-2001 (Explorer) 1997-2001 (Mountaineer) | 48,779 |
| Ford Subclass II | 1995-2001 (Windstar) | 19,625 |

The following named Plaintiffs will serve as Class Representatives:

| Class Representative | Subclass | Class Vehicle |
|----------------------|----------|---------------|
| 1. Thomas Dillingham | Ford Subclass I | 1998 Ford Explorer |
| 2. Sharon E. Jenkins | Ford Subclass I | 2000 Mercury Mountaineer |
| 3. Washington Richardson | Ford Subclass II | 2000 Ford Windstar |

Compl. ¶¶ 10-28. Each of the proposed Class Representatives is a Maryland resident who owns a Class Vehicle manufactured by one of the Defendants that contains a defective seating system.

**B.    The Defect**

Properly designed seating systems restrain their occupants against the rearward force produced by a crash. The Class Vehicles' seating systems, however, do not. Instead, they create an unreasonable risk that during a crash the seating system will collapse backwards. Compl. ¶¶ 41 d. & e.[6] Thus, the "Defect" in every Class Vehicle is

---

court may separate such claims from other claims in the action and certify them under the provisions of subsection [Federal Rule 23](c)(4)." *In re A.H. Robbins Co.*, 880 F.2d 709, 728 (4th Cir. 1989), *abrogated on other grounds by Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).

[6] A "moderate" severity collision "is one in which the collision's Delta V is between 19 to 24 mph." Similarly, "[a] 'minor' collision is defined as one having a Delta V or velocity change of 1 to 10 mph;"

the seating system's failure "to withstand moderate collision impacts . . . without significant deformation or rearward collapse of the backrest . . ." Compl. ¶ 36. As a result of the Defect, Class Members and rear seat passengers in Class Vehicles face "a substantial and unreasonable risk of personal injury or death . . ." Compl. ¶ 36.

The seating system in each proposed Class Representative's Class Vehicle contains the "Defect" and is not crashworthy in an ordinary rear-end collision. Testing data compiled and measured by Dr. Kenneth Saczalski, Ph.D. confirms that the Class Vehicles have insufficient seat strength:

| Vehicle Manufacturer | Class Vehicle | Model Years | Ave. Strength (lbs)/ Torque (inch-lbs) |
|---|---|---|---|
| Ford | Explorer | 1991-2001 | 660 lbs / 8,250 inch-lbs |
| Ford | Mountaineer | 1997-2001 | 780 lbs / 9,750 inch - lbs |
| Ford | Windstar | 1995-2005 | 1,100 lbs / 13,750 inch-lbs |

Table A to Report of Dr. Kenneth Saczalski, Ph.D., April 23, 2009, attached as Exhibit 4.

Based on the foregoing testing, the seating systems in the Class Vehicles demonstrate insufficient occupant protection by either:

1. Failing to support the "head", "neck" and/or "spine" of the seated occupant;

2. Failing to keep rear-seated occupants (like children) from harm during the event of seat collapse into the rear occupant space;

3. "Failing to function as intended"; and/or

4. "Generally having inadequate strength below 20,000 inch-pounds."

*Id.* at 2.

Defendants intentionally designed each seating system to have the Defect. Corporate representatives of each Defendant have consistently testified that they design

---

moreover, "a 'low' severity impact is one in which the collision's Delta V is 11 to 18 mph." *See* Report of Dr. Joseph Burton, M.D., April 30, 2009, at p. 3, attached as Exhibit 3.

their seats to "yield" at a specified level of force.  Roger Burnett, the Rule 30(b)(6) designee of Defendant Ford, testified that seats in the Explorer platform vehicles are designed knowing that "the seat will yield as a response" to loads in foreseeable accidents.  Deposition of Roger Burnett, 11/19/2008, at 53:14, relevant pages attached as Exhibit 5.

Testimony given by Russell Keith Davidson of Lear Corporation, a seatback supplier to the automotive industry, also confirms that seats can yield and nonetheless comply with Federal Motor Vehicle Safety Standard ("FMVSS") 207.  *See* Deposition of Russell Keith Davidson, 3/5/2009, at p. 34:21-23, relevant pages attached as Exhibit 6. Thus, a common thread among the seating systems in all Class Vehicles' seats is the pronounced tendency to yield at low levels of force.

| Manufacturer | Internal Criteria | Strength |
|---|---|---|
| Ford | SM-15 | 4290 inch-lbs |

Table 1 to the Report of Mr. Alan Cantor, April 30, 2009, attached as Exhibit 1. Plaintiffs' expert, Alan Cantor, has confirmed that the foregoing seat strength is insufficient to protect vehicle occupants: "[a]ll Class seats are designed to a strength in the 3900-6600 inch-pound range" and that "[t]his strength range is well below the value required for occupant protection dictated by the basic physics of foreseeable rear-end impacts."  *Id.* at p. 6.

The Defect poses the same or substantially the same risk in all Class Vehicles, without regard to the differences between manufacturers or car makes.  The "common denominator" by which scientists predict the "potential for a catastrophic, life threatening, or fatal injur[ies] to occur in a rear end collision" is "how the seatback . . . performs in the rear end crash."  *See* Report of Dr. Joseph Burton, M.D., at p. 12, Exhibit

3. "It is not specifically who manufactured the vehicle, which vehicle the seat is in, whether the failure of the seat is a product of structural failure, recliner mechanism failure, or failure of the seat to remain attached to the tracks or floor of the vehicle." *Id.* Rather, once the seatback fails – for whatever reason – "then the likelihood of a debilitating, life threatening and sometimes fatal injury is greatly increased." *Id.*

In short, as noted by Mr. Cantor, the seating systems pose an unreasonable risk of injury to the occupants of these vehicles because the seats will consistently and predictably fail rearward during foreseeable rear impacts that are otherwise protectable." Exhibit 1, at p.6. The failure of the seating systems in the Class Vehicles to restrain occupant(s) safely presents a substantial risk of serious bodily injury or death to the occupant and any back-seat passenger, including an infant or small child (who is compelled to sit in the back seat of a passenger car). Compl. ¶ 41 f.

### C.    Ford's Awareness of the Defect

Ford has known of the Defect and understood the risk of injury it presents for decades. Compl. at ¶ 63. In 1967, the National Highway Traffic Safety Administration ("NHTSA") adopted FMVSS 207, which only required 3,300 inch-pounds of resistance and 20 times the empty seat weight for rear-impact collisions. Exhibit 4 at p. 79. Just a year later in 1968, engineers within the automotive industry recognized the dangers associated with rear impact collisions. GM engineer Thomas Ruster noted that:

- "Seatback stiffness should be increased substantially – minimizing the tendency of the occupant to ramp up seatback";

- "[t]he concept of allowing a production vehicle seat to rotate rearward at a controlled rate as a means of limiting head rotation does not appear feasible";

- when a seat collapses there is a "high probability of interference with rear seat occupants"; and

- "potential hazard exists from the high compressive loads imposed on the cervical spine as the occupants head is being forced to the rear seatback."

*Id.*

By at least 1969, Ford was aware that integrating seat belts into vehicle seats would provide greater occupant protection. *See* Ex. 1, Cantor Report, at p. 10. For example, in 1969 R.J. Snyder, the head of biomechanics at Ford Motor Company in 1969, stated that "[t]he concept of integrated seat/seat belt systems is as old as 1903 and would offer many advantages and solve many problems of current systems *Id.*, at p. 10. Mr. Snyder further noted that the seat "...must be strong enough to protect against 40g loads." *Id.*, at p. 10. By 1973, Ford had "initiated programs, published reports, and run tests which show that improved head restraint with more rigid seats is the best approach to occupant protection in rear impact crashes." *Id.*, at p. 19.

In the 1970s, Ford and GM thwarted efforts to increase the minimum standard of FMVSS 207. Compl. ¶¶ 81-85. By 1981, GM and Ford had collectively convinced NHTSA to cease rear-impact vehicle testing. Compl. at ¶ 87. Ford maintained publicly that static testing was preferable and yielding seats were safe. Compl. ¶¶ 93-97. However, Ford has admitted that it did not design its seats to yield, stating that "...few design for controlled deformation...," and that "Ford Design and Test Practices include no specific criteria for seat performance in rear crash situations beyond the Federal standards and Ford's more stringent acceptance criteria." Cantor Report, at p. 18, *citing* Ford Motor Company internal document, Bates No. 8200-00828. Mr. Cantor also noted

"Ford's acceptance criterion is purely a strength level with no provisions or requirements for 'yielding.'" *Id.* at p. 18.

> Indeed, by 1989:
>
>> Ford and Various Foreign Manufacturers objected to any attempt to strengthen the 207 standard.   GM responded by indicating that strengthening seats could increase injury in rear impacts and that the weaker, collapsing seats (which the industry supporters describe as "yielding" even though all seats yield including the stronger types like "belt-integrated seats" (BIS)) were beneficial in mitigating injury.
>
> *See* Exhibit 4 at p. 82.

Moreover, Ford's Chief Scientist Dr. Priya Prasad has testified that "we know that there are injuries in production seats, so yes, people do get injured in seats, the current seats which do collapse." Exhibit 1, at p. 25, *citing* Prasad, P., Trial testimony, *Newman v. Ford Motor Co.*, June 8, 1995. Prior to 1992, however, Ford did not conduct *any* dynamic tests to determine how to design and manufacture front seats in order to minimize or eliminate the risk of occupant contact with the rear seat. Exhibit 1, at p. 27, *citing* Mezzadri, R. Deposition testimony, *Canfield v. Ford Motor Co. et. al.*, June 26, 2003. In sum, Ford has long known of – yet failed to do anything about – the Defect, and has shown an unconscionable disregard for the safety of American consumers.

## ARGUMENT

### A.   Standards Governing Class Certification

This Court has "wide discretion" in deciding whether to certify a class. *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 424 (4th Cir. 2003) (quoting *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001)).   Because class actions promote justice and judicial economy, "federal courts should give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will, in the particular

case, best serve the ends of justice for the affected parties . . ." *Gunnells*, 348 F.3d at 424 (quotations and citations omitted).  District courts must nonetheless undertake a "rigorous analysis" to ensure that a proposed class satisfies Rule 23.  *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 318 (4th Cir. 2006).

Although certification is not a decision on the merits, courts must look closely "at the facts relevant to the certification question and . . . make specific findings on the propriety of certification."  *Id.* at 319.  These findings may be necessary "even if the issues tend to overlap with the merits."  *Id.*  Even so, "[t]he likelihood of plaintiffs' success on the merits" remains irrelevant to the certification decision.  *Id*; *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974).  Indeed, "the sufficiency of the evidence . . . goes to the merits of Plaintiffs' case – an issue the Supreme Court has held courts may not consider in ruling on a motion for class certification."  *Gunnells*, 348 F.3d at 428.  The plaintiff bears the initial burden of proof under Rule 23.  *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001); *Int'l Woodworkers of Am. v. Chesapeake Bay Plywood Corp.*, 659 F.2d 1259, 1267 (4th Cir. 1981).

**B.     The Proposed Subclasses Each Satisfy Rule 23(a)**

A proposed class must meet four requirements: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy.     Fed. R. Civ. P. 23(a)(1)-(4).   Plaintiffs seek certification under Rule 23(b)(3), and thus, must also show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3). Each separate proposed Subclass "must independently meet all the requirements of (a) and at least one

of the categories specified in (b)." *A.H. Robbins Co.*, 880 F.2d at 728; *Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc.*, 254 F.R.D. 68, 76 (D.N.C. 2008).

### 1.   Each Proposed Subclass is Sufficiently Numerous

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "There is no mechanical test for determining whether in a particular case the requirement of numerosity has been satisfied. The issue is one primarily for the District Court, to be resolved in light of the facts and circumstances of the particular case." *Thomas v. Louisiana-Pacific Corp.*, 246 F.R.D. 505, 508 (D.S.C. 2007) (quoting *Kelley v. Norfolk & W. Ry. Co.*, 584 F.2d 34, 35 (4th Cir. 1978)). While "there does not appear to be a specific number above which numerosity will be satisfied and below which numerosity will not be satisfied," *Thomas*, 246 F.R.D. at 508, courts have found that classes with as few as forty members satisfy Rule 23(a)(1), *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 556 (D. Md. 2006). Importantly, plaintiffs need not show the exact size of the class for certification purposes. "To require such accuracy ... would foreclose most class litigation." *Id*; *see also General Telephone Co. v. E.E.O.C.*, 446 U.S. 318, 330 (1980) (noting that the numerosity requirement "imposes no absolute limitations").

There can be no serious dispute that the number of Class Vehicles located within Maryland satisfies numerosity. *See In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 78 (D. Md. 1991) (noting that "a class of as few as 25 to 30 members raises the presumption that joinder would be impracticable"). As noted in Exhibit 2, there are literally thousands of class vehicles within Maryland. There are 48,779 vehicles in Ford Subclass I and 19,625 vehicles in Ford Subclass II. These numbers easily satisfy Rule

23(a)(1). *See Mitchell-Tracey*, 237 F.R.D. at 556 (finding numerosity where "[p]laintiffs estimate the number [of class members] most certainly would exceed [ ] 40 . . .").

## 2.    The Proposed Class Representatives' Claims Are Typical[7]

Typicality ensures that "a class action is economical" and that "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gunnells*, 348 F.3d at 459 (*citing Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 337 (4th Cir. 1998)).   The typicality requirement seeks to ensure that the interests of "the representative part[ies] . . . [are] 'squarely aligned in interest' with the class members." 1 NEWBERG §3.01 at 3-4 to 3-5.   Thus, claims are typical if they arise "from the same event or practice or course of conduct," and "are based on the same legal theory . . . irrespective of varying fact patterns which underlie individual claims.  1 NEWBERG §3.13 at 3-76 to 3-77 (citations omitted).  In short, the class representative's "interest in prosecuting his own case must simultaneously tend to advance the interests of absent class members." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006).

The claims of the proposed Class Representatives are typical of those of the unnamed class members, as they all arise "from the same course of conduct," namely, the design, sale, and concealment of the defective seating systems in the Class Vehicles. *Robinson v. Fountainhead Title Group Corp.*, 252 F.R.D. 275, 287-88 (D. Md. 2008); *Mercedes*, 2009 U.S. Dist. LEXIS 35595, at *86-*87 (finding typicality where all class members "were affected by Mercedes's alleged concealment of [material information] . . . in the same way, and all suffered the same harm").   Factually, Ford's defective seating

---

[7]   Rule 23(b)(3)'s predominance requirement subsumes Rule 23(a) commonality, and thus, Plaintiffs' address commonality in § C.1.

systems and conspiracy to cover-up that design form the basis for the claims of every potential Class Member. The Defect is consistent within each Subclass and poses the same unacceptable risk of injury or death, regardless of vehicle or year model. Minor factual differences from Class Member to Class Member do not defeat typicality. *See Newsome v. Up-to-Date Laundry, Inc.*, 219 F.R.D. 356, 362 (D. Md. 2004) ("Factual differences between class members' experiences do not preclude certification if the class members share the same legal theory."). Moreover, all proposed Class Representatives have the same legal claims and theories, namely, Negligence (Count I), Strict Liability (Count II), Negligent Failure to Warn, Concealment, and Misrepresentation (Count III), Fraudulent Concealment and Intentional Failure to Warn (Count IV), Unfair Trade Practices (Count V), and Conspiracy (Count VI).

### 3.    The Proposed Class Representatives and Class Counsel are Adequate

Rule 23(a)(4)'s adequacy requirement "ensures that class counsel is competent and willing to prosecute the action and that no conflict of interest exists between the named parties and the class they represent." *Benway v. Res. Real Estate Servs., LLC*, 239 F.R.D. 419, 425-426 (D. Md. 2006) (*citing Amchem*, 521 U.S. at 625); *see also* NEWBERG §3.01 at 3-5 (adequacy requires "that the named plaintiff have no conflicts of interest with class members and that he or she prosecute the action vigorously on behalf of the class."). Thus, adequacy requires a two part inquiry. First, "class representatives must be part of the same class and possess the same interest and suffer the same injury as the class members." *Gunnells*, 348 F.3d at 425 (internal quotations and citation omitted). Second, the Court must verify that counsel is adequate to represent the class. *See Secretary of Labor v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986) (en banc); 7A

WRIGHT, MILLER, & KANE §1769.1 at 375 (observing that the court should consider the quality and experience of the attorneys for class).

The proposed Class Representatives here are adequate and there are no conflicts of interest between them and the Subclasses. As an initial matter, the nature of the claims asserted – a uniform product defect – supports a finding of adequacy. *See Daffin v. Ford Motor Co.*, 458 F.3d 549, 554 (6th Cir. 2006) ("No . . . conflict is apparent as long as the claims litigated by the class are based on the presence of a defect regardless of manifestation . . ."). Moreover, deposition testimony confirms that each proposed Class Representative is sufficiently informed and motivated to prosecute this action. The proposed Class Representatives need only be generally aware of the tenor and subject matter of the litigation. *See Twyman v. Rockville Housing Authority*, 99 F.R.D. 314, 323 (D. Md. 1983) (noting that Maryland courts do not "apply a hypertechnical knowledge requirement"). Even if a proposed representative has "demonstrated a somewhat limited understanding of the details of this litigation, there is no requirement under Rule 23 that [they] . . . be able to understand the intricacies of the litigation or their role in it." *Id.* (citing *Surowitz v. Hilton Hotels* Corp., 383 U.S. 363, 372-73 (1966)); *Wellman v. Dickinson*, 79 F.R.D. 341, 347 (S.D. N.Y. 1978). Indeed, "Rule 23 does not require the representative plaintiffs to have extensive knowledge of the intricacies of litigation, rather, the named plaintiffs must have a general knowledge of what the action involves and a desire to prosecute the action vigorously." *Benway*, 239 F.R.D. at 426 (citing 7A Wright, Miller & Kane, Federal Practice and Procedure § 1766 (3d ed. 2005)). Each proposed Class Representative has exhibited a requisite level of understanding of the subject matter of this litigation and their roles therein. *See* Deposition of Thomas

Dillingham, Exhibit 7, at pp. 45:3-17; 52:9-20; Deposition of Sharon Jenkins, Exhibit 8 at pp. 40:20-23; 119:13-121:8; and Deposition of Washington Richardson, Exhibit 9, at p. 28:4-25.

Likewise, Class Counsel here are adequate to represent the proposed Subclasses. Factors in this analysis include the vigor of counsel, their experience and diligence. *See Central Wesleyan College v. W.R. Grace & Co.*, 143 F.R.D. 628, 637 (D.S.C. 1992), *aff'd*, 6 F.3d 177 (4th Cir. 1993); *Baby Neal v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994) (explaining that adequacy of representation assures "that the attorneys for the class representatives are experienced and qualified to prosecute the claims on behalf of the entire class"). "This rule ensures that class counsel is competent and willing to prosecute the action . . ." *Benway* 239 F.R.D. at 426 (*citing Amchem*, 521 U.S. at 625).

The undersigned Class Counsel have the skill and experience necessary to prosecute this action. Resumes of the law firms and attorneys prosecuting this litigation are attached as Exhibit 10. Motley Rice LLC attorneys, Lead Counsel for the Class, have a long history of vigorously and successfully prosecuting large scale class actions. There is no suggestion on this record (reaching back to 1998, when the first class action complaint was filed) of collusion. In short, both the proposed Class Representatives and Class Counsel are adequate.

**C.     The Proposed Subclasses Satisfy Rule 23(b)(3)**

> **1.     Common Questions of Law and Fact Predominate Over any Individual Issues Within Each Subclass**

Plaintiffs seek certification of each Subclass under Rule 23(b)(3), and thus, must show that common "questions of law or fact . . . predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).   Predominance "tests whether

proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). A plaintiff need not show complete identity among all members of the class as to all questions of law or fact. Instead, a plaintiff must show only that common questions outweigh individual questions. *Chisolm v. TranSouth Fin. Corp.*, 184 F.R.D. 556, 565 (E.D. Va. 1999). Those common questions "need not be dispositive of the entire litigation. *Id.*

Rule 23(a)(2)'s commonality requirement is "subsumed under, or superseded by, the more stringent Rule 23(b)(3) [predominance] requirement" *Lienhart*, 255 F.3d at 146 n.4 (quoting *Amchem*, 521 U.S. at 609).[8] Because the proposed Subclasses each satisfy predominance, as discussed *supra*, they also satisfy commonality. *See Emig v. Am. Tobacco Co.*, 184 F.R.D. 379, 385 (D. Kan. 1998) (noting that "there is no reason to separately analyze commonality").

In this case, the following common issues predominate:

- Whether the seating systems are defective and create a substantial and unreasonable risk of personal injury or death to Class Members;

- Whether Defendants knew about the defect and conspired to conceal it from consumers; and

- The amount of compensatory damages that each Class Member is entitled to because of the Defect.

The resolution of these central issues will outweigh any individualized issues arising from Plaintiffs' claims, and thus, predominance is satisfied. *See Chisolm*, 184 F.R.D. at 565.

---

[8] "Commonality requires that there are questions of law or fact common to the class." *Linehart*, 255 F.3d at 156 (quoting Fed. R. Civ. P. 23(a)(2)). Commonality exists when a given question "can be resolved for each class member in a single hearing . . ." *Thorn*, 445 F.3d at 319. On the other hand, commonality is absent "if [ ] resolution 'turns on consideration of the individual circumstances of class member.'" *Id.* Plaintiffs' proposed Subclasses easily meet this standard because all members of the potential Class Members own vehicles with defective seating systems and "share the same legal theory." *Peoples v. Wendover Funding, Inc.*, 179 F.R.D. 492, 498 (D. Md. 1998).

### i.     *The Defect and risk of injury to the Class present common issues*

The Defect is the same or substantially the same, and creates the same risk of injury, within each Subclass.  Obviously, for Ford Subclass II, which consists of a single vehicle, there is absolutely no difference in the Defect or the risk of *See* Exhibit 4, Table A, at p. 1.

Although Ford Subclass I contains two vehicles, there are no substantial individual differences between the Explorer and the Mountaineer that affect certification. First, the Ford and the Mountaineer are substantially similar and have the same seating systems – despite having different names.   Roger Burnette, Ford's 30(b)(6) witness, testified that the Mountaineer is "an Explorer structure" and "uses Explorer seats." Deposition of Roger Burnett, 11/19/2008, at  pp. 92:14; 93; 95, relevant pages attached as Exhibit 5.  Mr. Burnett also testified that all Explorer platform vehicles within the State of Maryland perform similarly "in terms of how the seat back responds to loading."  *Id.* at 135:21-136:5.  Moreover, irrespective of minor differences in the componentry of various vehicles, Mr. Burnett has noted that "[t]he seat back strength of the complete system is going to be within the same range of – of stiffness.  One  is not going to be dramatically different than the other."  *Id.* at 51:14-17; *see also* Deposition of Roger Burnett from *Hill v. Ford*, 65:7-15 attached as Exhibit 11 (noting that the seat in a '91 Explorer is substantially similar to the seat in the 2001 Explorer from the standpoint of rear impact performance).

Second, individual differences between the seating systems within each Subclass (e.g., trim or component parts) do not affect predominance.  The Defect is the lack of strength in each seating system *as a whole*.  Compl. ¶40.  In fact, Defendants have

promulgated criteria for *overall* seat performance. *See supra*, Table 1 to Exhibit 1. Plaintiffs' expert Alan Cantor has explained that seat strength as a whole is consistent for all Class Vehicles: "[a]ll Class vehicles have seats that are constructed to substantially similar strength criteria." *See* Exhibit 1 at p. 5. Mr. Cantor has tested each of the Class Vehicles' seating systems, and has "found remarkable comparability of the Class vehicles' seat strength." *Id.* Mr. Cantor also noted that "[t]he defects noted with Ford seats ... are substantially the same . . .." *Id.* at p. 7. In sum, any minor individual differences in seat design within each Subclass do not affect predominance because the overriding common issue is the same in all Class Vehicles.

Finally, the Defect creates the same or substantially the same risk of injury within each Subclass. As Mr. Cantor has explained "the devastating results that these defects cause are the same throughout the Class." Exhibit 1 at p. 7. Similarly, Dr. Burton has noted that the "common denominator" that predicts risk of serious injury in any given Subclass is "how the seatback . . . performs in a rear end crash . . .." *See* Exhibit 3, at p. 12. Thus, as Dr. Burton has explained:

> There is a common denominator by which a scientist or others can predict that there is significant potential for a catastrophic, life threatening, or fatal injury to occur in a rear end collision. This common denominator is how the seatback of the seat in which the occupant is sitting performs in the rear end crash.... *The type and severity of injury is strongly associated with performance criteria. It is not specifically who manufactured the vehicle, which vehicle the seat is in, whether the failure of the seat is a product of structural failure, recliner mechanism failure, or failure of the seat to remain attached to the tracks or floor of the vehicle. Once the seatback and seat no longer act as a "restraint" and protective device for the occupant, then the likelihood of a debilitating, life threatening and sometimes fatal injury is greatly increased.*

*Id.* (emphasis added).

Similarly, Dr. Saczalski has noted that:

> While the weak, collapsing CA type seats do have some differences in construction, ultimately, the measure of similarity, or *"substantial similarity"*, within a class or group of seats should not be based on the individual details of how the seat is constructed, but rather should be based on how similar the seats protect within a given group (or do not protect) the occupants in that seat group.

Exhibit 4 at p. 4.

Moreover, as noted by Mr. Cantor, the weak, yielding seats have been described by Defendants own expert witnesses as substantially similar across vehicle lines and manufacturers. An engineer who is routinely hired by Defendants to testify in vehicle seat cases has stated under oath that:

> Q. In your experience, and based on your review of 301 tests, would you say that the [Ford] Explorer performs comparable to other vehicles in the 1991 era?
>
> A. It performed exactly the same as other similar yielding seats.
>
> Q. You tested the [Pontiac] Sunbird under the same seat – under the same circumstances?
>
> A. Yes, we did.
>
> Q. And what was the finding then in that regard, do you recall?
>
> A. I don't remember the specific number, but it worked out to be a little bit less. But again right around the mid-point. *Most seats – you'll find most yielding seats are within a fairly narrow range.* The Sunbird also is a yielding seat. It yielded by a slightly different mechanism, but it also yielded, and yielded at a lower maximum yield strength.

*See* Cantor Report, Exhibit 1, at pp. 20-21 (*citing* Levitt, A., Trial testimony, *Carillo v. Ford Motor Co.*, October 29, 1999 (emphasis added)). In short, the risk of injury within in each Subclass – regardless of which Class Vehicle is involved – remains constant because the primary driver of that risk is the propensity of the seatback to collapse.

ii.     ***Defendants' knowledge and concealment of the Defect present common issues***

Factual issues surrounding Defendants' knowledge and concealment of the Defect also present common issues. "Predominance is . . . readily met in certain cases alleging consumer . . . fraud . . ." *Amchem*, 521 U.S. at 625; *see also Mercedes*, 2009 U.S. Dist. LEXIS, at *92 (finding predominance where "consumer fraud claim turn[ed] on the knowledge and actions of the company rather than those of the individual class members . . ."). "A fraud perpetrated on numerous person by the use of similar misrepresentations may be an appealing situation for a class action . . ." Fed. R. Civ. P. 23(b)(3) advisory committee's note.   So long as there are no "material variation[s]" in Defendants' misrepresentations or plaintiffs' reliance, class treatment is appropriate. *See id.*

Here, there were no variations in Defendants' tortious conduct directed towards the Plaintiffs.   Plaintiffs' allege that Defendants committed a long-running consumer fraud intentionally concealing information regarding the seating systems in their vehicles. Compl. ¶¶ 101-11, 126.   Likewise, Defendants have knowingly designed and sold vehicles in a defective, unreasonably dangerous condition. Defendants' fraudulent omissions and course of conspiratorial conduct were uniform as to all Class Members, and thus, common issues predominate. *See City P'ship Co. v. Jones Intercable, Inc.*, 213 F.R.D. 576, 582 (D. Colo. 2002) (finding predominance where the complaint alleged "material misstatements or omissions common to the entire class"); *Lerch v. Citizens First Bancorp., Inc.*, 144 F.R.D. 247, 252 (D.N.J. 1992) (recognizing that cases involving a "unitary scheme or course of conduct" are appropriate for class certification (quotations and citations omitted)).

Moreover, the reliance element of Plaintiffs' fraud and misrepresentation claims will not overwhelm common issues in this case because it can be presumed. *See*

*Gunnells*, 348 F.3d at 437 n.12 (noting that "proof of individual reliance need not overwhelm the common issues in every case").   Plaintiffs' claims rest primarily on a theory of omission – Defendants intentionally concealed the fact that their seating systems were not strong enough.   Complaint ¶ 75-97.   "[C]ases involving omissions create difficult problems of proof of reliance." *Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 50 (1977).   As the Supreme Court has recognized, to require a plaintiff to prove "how he would have acted if omitted material information had been disclosed . . . would place an unnecessarily unrealistic evidentiary burden on the" plaintiff.   *See Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988).

In *Mercedes*, although the court found that reliance was not an element of the plaintiffs' claims, it nonetheless concluded that reliance – if it were required – would not preclude certification.   *See* 2009 U.S. Dist. LEXIS, at *98 ("reliance similar to that required in common law fraud claims . . . would not render class certification inappropriate").   The court reasoned that it is "well-established that plaintiffs asserting fraud claims 'involving primarily failure to disclose' material information need not demonstrate 'positive proof of reliance' in order to recover." *Id.* (quoting *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 153 (1972)).   "All that is necessary is that the facts withheld be material in the sense that a reasonable [purchaser] might have considered them important in the making of [his or her] decision." *Id.* (quoting *Ute*, 406 U.S. at 153-54).   Thus, in cases involving primarily intentional concealment the Fourth Circuit has been willing to presume reliance, *see, e.g., Edens v. Goodyear Tire & Rubber, Co.*, 858 F.2d 198, 206-07 (4th Cir. 1988) (recognizing that "proof of reliance on the concealment was not required for it was practically impossible to prove . . . reliance on

that which had been intentionally concealed."); *see also Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1036 (4th Cir. 1997) (recognizing that "reliance can often be inferred in a failure-to-disclose case"); *Carras v. Burns*, 516 F.2d 251, 257 (4th 1975) (recognizing that it "may be inferred that the customer would have relied on the broker's statement or, in the case of non-disclosure, that he would have relied on the information had he known it"), and this Court may do so here as well, *see Mercedes*, 2009 U.S. Dist. LEXIS 35595, at *98.

### iii.    *The potential for individual damage determinations does not prevent class certification*

Finally, individualized damage inquiries do not preclude certification.    *See Mercedes*, 2009 U.S. Dist. LEXIS 35595, at *95 ("The amount of Plaintiffs' 'ascertainable loss,' which will serve as the basis for quantifying damages at trial is easily calculated using common proof.").   First and foremost, because each Subclass features substantially similar vehicles, the damages sought, namely, the cost to repair and/or replace the seating systems, should not be appreciably different within each subclass.   In any event, predominance is not defeated by questions of individual damages, so long as liability is subject to common proof.   *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 28 (1st Cir. 2008).   Indeed, "Rule 23 contains no suggestion that necessity for individual damage determination destroys commonality, typicality, or predominance, or otherwise forecloses class certification. In fact Rule 23 explicitly envisions class actions with such individualized damage determinations." *Gunnells*, 348 F.3d at 427-28; *see also In re Honda Motor Co., Inc. Dealerships Relations Litig.*, 979 F. Supp. 365, 367 (D. Md. 1997) (finding that "liability issues – concerning alleged wrongdoing over a substantial period of time by many executives of the Honda

defendants, numerous Honda dealers, and a law firm said to be involved in an ongoing coverup of the illegal scheme – far exceed in complexity the more mundane individual damages issues").

### 2.    Class Adjudication is Superior to Thousands of Individual Actions

The proposed Subclasses must also be a superior method of adjudication.  Fed. R. Civ. P. Rule 23(b)(3).  Superiority is satisfied when class treatment "would achieve economies of time, effort, and expense, and promote . . . uniformity of decision . . . without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615.  The court's inquiry focuses on the following four factors:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions, (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class, (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).

Adjudicating the instant case on a class-wide basis squarely satisfies the superiority requirement.  First, potential Class Members would likely have little motivation to file separate individual lawsuits if certification is denied.  Although the amount of damages per Class Vehicle is not insubstantial, it is not enough to economically justify litigation against the Nation's largest automakers.  The Fourth Circuit has recognized that certification is superior when it "will provide access to the courts for those with claims that would be uneconomical if brought in an individual action." *Gunnells*, 348 F.3d at 426; *Amchem*, 521 U.S. at 617 ("the policy at the very core of the class action mechanism is to overcome the problem that small recoveries do

not provide the incentive for any individual to bring a solo action prosecuting his or her rights"). Thus, "[t]his is precisely the kind of case that class actions were designed for, with small or statutory damages brought by impecunious plaintiffs who allege similar mistreatment by ... comparatively powerful defendant[s]." *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 560 (D. Md. 2006) (*quoting Van Jackson v. Check 'N Go of Ill., Inc.,* 193 F.R.D. 544, 547 (N.D. Ill. 2000); *see also Mercedes*, 2009 U.S. Dist. LEXIS 35595, at *99-*100.

The second factor focuses upon the extent and nature of litigation concerning the controversy that has already been commenced. This evaluation "is aimed at determining whether there is so much pre-existing litigation that a class would be unproductive . . . ." *Central Wesleyan College v. W.R. Grace & Co.*, 143 F.R.D. 628, 640 (D.S.C. 1992), *aff'd,* 6 F.3d 177 (4th Cir. 1993). Undersigned counsel are not aware of any other currently pending litigation raising the identical issues involved in this case. Because the proposed Subclasses include only Maryland residents who have not been personally injured in a car accident, it is unlikely that this litigation would overlap with litigation in venues other than Maryland.

The third factor encompasses two inquires: (1) "whether allowing a Rule 23(b)(3) action . . . will prevent duplication of effort and the possibility of inconsistent results," and (2) whether the chosen forum is appropriate. 7A WRIGHT, MILLER, & KANE, *supra*, §1780, at 572-73 (citations omitted). Because certification will allow all potential Class Members to adjudicate the common issues in a single forum, this case promises to save significant time and resources for potential Class Members, Defendants and the courts. *See Gunnells*, 348 F.3d at 426. Moreover, the proposed Subclasses involve only

Maryland residents, and thus, Maryland federal court is the most convenient location for this litigation.

Finally, the proposed Subclasses are manageable. This inquiry focuses on the practical problems the Court will face administering this class action. *See Central Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177, 185 (4th Cir. 1993); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974) (noting that manageability "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit"). Trial courts are granted "special deference" in deciding the manageability issue, *Gunnells*, 348 F.3d 433, because they have "greater familiarity and expertise" with the practical problems of administering a lawsuit, *Central Wesleyan*, 6 F.3d at 185. This case involves relatively narrow Subclasses and only involves Maryland residents and much more complex nationwide cases have been certified. *See, e.g., Mercedes*, 2009 U.S. Dist. LEXIS 35595, at *101 (finding that certification "would not give rise to any difficulties that would make" the litigation unmanageable). Moreover, the focus of the litigation is Defendants' conduct and how it uniformly affected all potential Class Members, and there are few, if any, individualized issues that will require participation by unnamed plaintiffs. Thus, this case does not present manageability problems.[9]

### III.    CONCLUSION

The requirements of Rule 23(b)(3), FRCP, are met, and this case is appropriate for class certification under Rule 23(c). Plaintiffs request that the Class be certified, that

---

[9] Even assuming the Court believed that manageability problems might arise, it would be appropriate to conditionally grant class certification, while retaining the authority to later decertify the class. *E.g., Gunnells*, 348 F.3d at 433.

Plaintiffs be appointed as Class Representatives, that undersigned counsel be appointed as class counsel, and that the Court direct the parties to present to the Court for approval a proposed methodology for notification of Class Members.

      Respectfully Submitted,

      This the 15th day of June, 2009

                    MOTLEY RICE LLC

By: _____

                    Kevin R. Dean, Esquire
                    William Narwold, Esquire
                    W. Taylor Lacy, Esquire
                    Lance V. Oliver, Esquire
                    MOTLEY RICE LLC
                    28 Bridgeside Boulevard
                    Mount Pleasant, SC 29464
                    843-216-9000

                    William F. Askinazi, Esquire
                    LAW OFFICES OF WILLIAM F. ASKINAZI
                    12504 Palatine Ct.
                    Potomac, MD 20854
                    301-983-5110

                    Stephen H. Ring, Esquire
                    STEPHEN H. RING, P.C.
                    20300 Seneca Meadows Parkway, Suite 200
                    Germantown, MD 20876
                    Maryland Bar No. 04731764
                    301-540-8180

                    John M. Mason, Esquire
                    c/o LAW OFFICES OF STEPHEN H. RING, P.C.
                    OBA Bank Building, Suite 200
                    20300 Seneca Meadows Parkway
                    Germantown, MD 20876

                    *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** has been served upon counsel of record via electronic mail, as consented to by the parties in writing in accordance with Fed. Rule Civ. P. 5(b)(2)(E) this 15th day of June, 2009:

John D. Wilburn, Esquire
Andrew John Trask, Esquire
Michael J. Elston, Esquire
McGuire Woods LLP
1750 Tysons Blvd., Suite 1800
McLean, VA 22102

Derek H. Swanson, Esquire
John Tracy Walker, IV, Esquire
McGuire Woods LLP
901 E. Cary St.
Richmond, VA 23219

M OTLEY RICE LLC

Kevin R. Dean, Esquire