IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TIMOTHY LLOYD, *et al.*,                    *

    Plaintiffs,                              *

    v.                                       *                    CIVIL NO. L-07-2487

                         *

GENERAL MOTORS CORPORATION,                 *
*et al.*,                                   *
                         *

    Defendants.                              *

## MEMORANDUM

## I.  INTRODUCTION

Now pending is the plaintiffs' Motion to Certify Class.  Paper No. 243.  The plaintiffs

seek to certify a class that includes all Maryland residents who currently own Ford Explorers,

Mercury Mountaineers or Ford Windstars for certain model years.  They allege that the front

seats in the class vehicles are defective because they are prone to collapse rearward in moderate

speed rear-impact collisions.  The suit does not seek to recover for personal injuries caused by

the alleged defect.  The proposed class specifically excludes persons who have suffered personal

injury while driving in class vehicles.  The suit demands damages from Ford Motor Company

("Ford") for the cost of repairing or replacing the front seats in each class vehicle.

The Court will, in a separate order of even date, DENY the motion.  The plaintiffs will be

given leave to attempt to reformulate a narrower class that avoids the problems discussed herein.

Failing that, the Court will dismiss the case so that the plaintiffs may pursue their individual

claims, which arise under Maryland law, in state court.

Plaintiffs filed their certification motion under Fed. R. Civ. Pro. 23(b)(3).  In order for a

23(b)(3) class action to proceed, the plaintiffs must establish that (i) common issues predominate

over individual issues, (ii) a class action is superior to other available methods of adjudication, and (iii) a class action would be manageable.  As discussed herein, none of these conditions is satisfied.

The plaintiffs contend that the seats in the class vehicles are unsafe because they tend to deform or collapse rearward in moderate speed rear-impact collisions.  This poses a risk that the seat's occupant may hyperextend backwards over the top of the seat, or be hurled into the rear compartment.  Both occurrences also pose risks to individuals, especially children in car seats, sitting behind the deforming seat.  Plaintiffs posit that for an automobile to be reasonably safe (non-defective), its seats must be able to withstand 20,000 inch-pounds of torque without deforming backwards.  Because every class vehicle fails to meet this standard, the plaintiffs maintain that all are defective.

Plaintiffs envision a relatively simple trial that would focus on whether 20,000 inch-pounds is an irreducible safety benchmark for car seats.[1]  Ford disagrees, contending that the trial would be unmanageable.  Determining the safety of a single car's seating system is a complex undertaking.  Because the class vehicles were manufactured with twenty-three different seating system configurations, the jury would be faced with a task of hopeless complexity, Ford maintains.

Ford has the better part of the argument.  Crashworthiness involves a vehicle's ability to withstand a myriad of accidents, including front, side, and rear impacts at low, moderate, and high speeds.  Design changes that make a car better able to withstand one type of crash may make the car less safe in others.  The jury would be required to decide whether strengthening the

---

[1] At the December 4, 2009 hearing, plaintiffs suggested that the jury might find the various seating systems defective without stating a rigidity benchmark.  Paper No. 275, p. 4.  This suggestion must be rejected.  The verdict sheet must specify why the product is defective so that Ford would know how to correct the problem.  As discussed *infra*, the result of a plaintiffs' victory would be to set a new design standard for seating systems, and one must know, in sufficient detail, what that standard is.

seats to better protect occupants in moderate speed rear-impact collisions would create unacceptable vulnerabilities in other contexts.

Moreover, the National Highway Transportation Safety Administration has stated that determining a seating system's safety requires understanding the "compatible interaction" of the system's components, including the seats, seatbelts, headrests, reclining mechanisms, air bags, and floor pan attachments. 69 Fed. Reg. 67068, 67069 (Nov. 16, 2004). In other words, seatback strength is but one element in the seating system safety equation.

The class vehicles feature twenty-three different seating system configurations, utilizing, *inter alia*, a variety of seat strengths, headrest types, and reclining mechanisms as installed in vehicles that differ in terms of size and weight. At trial, the jury would be required to return a verdict on each of the twenty-three configurations. Moreover, if the jury found a seating system defective, the Court would be faced with the daunting task of determining whether the vehicle could be safely retrofitted to meet the 20,000 inch-pound standard. A trial involving such complexities would not only be unwieldy, but unmanageable. Hence, the plaintiffs cannot satisfy the predominance and manageability requirements.

Next, plaintiffs' complaint includes counts alleging negligent failure to disclose, fraudulent concealment, and deceptive trade practices. The purchaser's reasonable reliance is an element of each of these torts. Determining reliance requires an individualized inquiry, consumer by consumer, that is not susceptible to class treatment. Hence, these counts would necessarily be dismissed were the class action to proceed.

Additionally, around the country, consumers have brought personal injury suits involving the seatback rigidity issue, winning some and losing others. If the instant case were to proceed as a class action and the jury returned a verdict for Ford, a class member who was subsequently

injured in a class vehicle would be collaterally estopped from claiming that the vehicle's seats were defective because they lacked sufficient rigidity.  Such a class member, who has relatively little to gain from the instant class action, might be precluded thereafter from prosecuting a substantial personal injury claim.

## II.   **PROCEDURAL HISTORY**

This case began on June 15, 1999, when plaintiffs Timothy and Bernadette Lloyd filed a class action complaint in the Circuit Court for Montgomery County, Maryland against General Motors Corp. ("GM"), Ford, and Chrysler LLC ("Chrysler").  In an amended complaint, the plaintiffs added Saturn Corp. ("Saturn") as a defendant.  Paper No. 5.  The suit alleged that the seats in certain of the automobiles manufactured by the defendants were unreasonably dangerous because they were unable to withstand the force of a moderate impact rear-impact collision without deforming or collapsing.  The plaintiffs sought damages for the cost of replacing or repairing the allegedly defective seating systems.

In their Third Amended Complaint, the plaintiffs asserted seven counts, as follows:

Count 1:  Negligence in the design and manufacture of the seats.

Count 2:  Strict liability because the seats were defective, rendering them inherently dangerous, and creating an unreasonable risk of serious injury or death.

Count 3:  Breach of the implied warranty of merchantability.

Count 4:  Negligent failure to disclose, failure to warn, concealment, and misrepresentation.

Count 5:  Fraudulent concealment and intentional failure to warn.

Count 6:  Unfair or deceptive trade practices under the Maryland Consumer Protection Act.

Count 7:  Civil conspiracy.

In response to the Third Amended Complaint, the defendants moved jointly to dismiss. Among other arguments, the manufacturers contended that plaintiffs' claims were barred by the economic loss doctrine because the plaintiffs had suffered no actual injury.  In March 2000, the Circuit Court for Montgomery County granted the motion to dismiss, agreeing that plaintiffs' claims were, in fact, barred by the economic loss doctrine.[2]

The plaintiffs appealed to the Court of Special Appeals of Maryland, which affirmed the dismissal in an unreported opinion dated July 11, 2001.  Lloyd, et al. v. General Motors Corp., et al., No. 298 (Md. Ct. Spec. App. July 11, 2001).  The plaintiffs then petitioned the Maryland Court of Appeals for a writ of certiorari.  The Court of Appeals agreed to hear the case during its September 2002 term.

The Court of Appeals heard oral arguments in 2002 but did not issue its opinion until February 8, 2007, when it reversed and reinstated the plaintiffs' Third Amended Complaint. Lloyd, et al. v. General Motors Corp., et al., 916 A.2d 257 (Md. 2007).  In a significant pronouncement of Maryland law, it delineated an exception to the economic loss doctrine. According to the Court of Appeals, the doctrine does not bar a claim if a plaintiff sufficiently pleads that the product at issue, while having caused no actual harm, creates a dangerous condition, one that gives rise to a clear danger of death or personal injury.  Id. at 266.

The Court of Appeals noted that historically damages in product liability cases are categorized as either (1) personal injuries, (2) physical harm to tangible property, or (3) intangible economic loss stemming from the inferior quality of a product or the product's unfitness for the purpose for which it was purchased.  Id. at 265.  In its discussion, the court

---

[2] The Circuit Court for Montgomery County made no determination on defendants' arguments that plaintiffs' claims were time-barred or that the plaintiffs lacked standing to sue.

observed that the first two categories were inapplicable because the proposed class expressly

excluded those who had suffered a personal injury or property damage.  Thus, the class plaintiffs

were asserting damages exclusively in the third category, namely economic loss.

Whether the plaintiffs could fit themselves into the economic loss category was the main

topic of discussion in the Court of Appeals's opinion.  As the Court of Appeals observed,

ordinarily "damages for economic loss are not available in a tort action and are recoverable, if at

all, in contract causes of action and, in the case of fraud, in actions for deceit."  Id.  Applying this

traditional rule, the lower state courts had held that the economic loss doctrine barred the

plaintiffs' claims because (i) the seats were functioning as intended, namely as automobile seats,

(ii) the class plaintiffs, by definition, had not suffered any actual injury to person or property, and

(iii) the plaintiffs had failed to plead fraud with the particularity required by the Maryland Rules.

The Court of Appeals reversed and remanded.  Reviewing Maryland cases, the court

expressly recognized a limited exception to the economic loss doctrine that arises when the

defective product poses a substantial and unreasonable risk of death or personal injury.

> Thus, in order to assert a cognizable product liability theory of recovery, an action
> sounding in tort, but one premised on economic loss alone, the plaintiff must
> allege facts that demonstrate that the product at issue creates a dangerous
> condition, one that gives rise to a clear danger of death or personal injury.

Id. at 266.

Applying this exception to the allegations of the Third Amended Complaint, the Court of

Appeals concluded that the alleged risk of death or personal injury was sufficient to bring the

case, at least at the motion to dismiss stage, within the sweep of the exception.  Id. at 270.  Based

upon this foundation, the Court of Appeals addressed the Third Amended Complaint's seven

counts, holding that each was sufficiently plead under Maryland law.  With respect to Counts 3–

7, which alleged various forms of fraud, misrepresentation, and concealment, the court held that

the allegations were plead with sufficient particularity.  Hence, the Court of Appeals remanded the case for further proceedings.

     After remand to the Circuit Court for Montgomery County, the plaintiffs, in August 2007, filed a Fourth Amended Complaint.  Whereupon, the defendants removed the case to federal court.  Removal was predicated on the Class Action Fairness Act of 2005 ("CAFA"), which Congress enacted while the case was pending in the Court of Appeals.[3]  This statute permits certain class actions to be removed to federal court provided there is minimal diversity between the parties.

     The plaintiffs opposed removal.  By its terms, CAFA applies only to actions "commenced" on or after February 18, 2005.  28 U.S.C. § 1332 note (Supp. V 2005).  The plaintiffs argued that CAFA is inapplicable because the instant suit "commenced" with the filing of the plaintiffs' initial complaint in June 1999.  This Court disagreed.  In a Memorandum and Order of June 6, 2008, the Court ruled that the material changes in the plaintiffs' Fourth Amended Complaint effectively "commenced" a new action for purposes of CAFA.  Paper Nos. 126 & 127.

     In December 2008, this Court granted the plaintiffs' motion for leave to file a Fifth Amended Complaint, which is now the operative complaint.  The Fifth Amended Complaint, which was filed on March 4, 2009, includes an extensive list of class vehicles manufactured by the four defendants.[4]  In May and June 2009, GM, Saturn, and Chrysler filed for bankruptcy

---

[3] Pub. L. No. 109-2, 119 Stat. 4 (codified as amended at 28 U.S.C. §§ 1711–15 (Supp. V 2005)).

[4] The counts alleged in the Fifth Amended Complaint are as follows:

        Count 1:  Negligence
        Count 2:  Strict Liability in Tort — Restatement (Second) of Torts § 402A
        Count 3:  Negligent Failure to Disclose, Failure to Warn, Concealment and Misrepresentation
        Count 4:  Fraudulent Concealment and Intentional Failure to Warn
        Count 5:  Unfair or Deceptive Trade Practices, Maryland Consumer Protection Act (CL § 13-301 et seq.)
        Count 6:  Civil Conspiracy

The plaintiffs did not allege breach of implied warranty of merchantability in the Fifth Amended Complaint.

protection under Chapter 11.  The automatic bankruptcy stay ended, at least for the present, their

participation in the instant case.   Since last June, Ford has been the only active defendant.

Because of the bankruptcies, the plaintiffs began reducing the roster of class vehicles.  On

June 15, 2009, the plaintiffs filed their Motion for Class Certification, which narrowed the

proposed class to all Maryland residents who currently own a Ford Explorer, Mercury

Mountaineer, or Ford Windstar manufactured for the following model years:

> Ford Subclass I:  All Maryland residents that own Ford Explorers, model years
> 1991–2001, and/or Mercury Mountaineers, model years 1997 through 2001.

> Ford Subclass II:  All Maryland residents that own Ford Windstars, model years
> 1995 through 2001.

Paper No. 243, ex. 1, p. 4.

Following the filing of the motion, the parties completed discovery and fully briefed the

issues.  The Court held hearings on November 17 and December 4, 2009.  Before each hearing,

the Court submitted a list of questions for counsel to address.  Paper Nos. 259 & 262.  Having

reviewed the extensive record, the Court issues the instant Memorandum and a separate Order

denying class certification.[5]

## III.   DISCUSSION

A class action is "an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only."  Califano v. Yamasaki, 442 U.S. 682, 700–01

(1979).  "It is axiomatic that the procedural device of [Fed. R. Civ. P.] 23 cannot be allowed to

expand the substance of the claims of class members."  Broussard v. Meineke Discount Muffler

Shops, Inc., 155 F.3d 331, 345 (4th Cir. 1998).  To sustain a class action motion, plaintiffs have

---

[5] Now pending in this matter are three motions:  a Motion to Certify Class (Paper No. 243), a Motion to Exclude the
Testimony of Kenneth Saczalski (Paper No. 248), and a Motion to Strike the Report of William "Bill" Williams
(Paper No. 255).  The Order of even date dismisses the motion to exclude and the motion to strike as moot.  The
Court will consider them in the event that plaintiffs seek to reformulate a narrower class.

the burden of satisfying all four requirements of Rule 23(a), and they must fit within a type of

class action described in Rule 23(b).  As mentioned, plaintiffs have posited a Rule 23(b)(3) class.

A district court must undertake a "rigorous analysis" to ensure that the requirements of

class certification have been satisfied.  Hewlett v. Premier Salons Int'l, Inc., 185 F.R.D. 211, 215

(D. Md. 1997).  In this undertaking, the court may not pass judgment on the merits of a

plaintiff's case.  Nevertheless, it is necessary for the court to "probe behind the pleadings before

coming to rest on the certification question." Gen. Tel. Co. of Southwest v. Falcon, 457 U.S.

147, 161 (1982).  The Fourth Circuit has written that

> If it were appropriate for a court simply to accept the allegations of a complaint at
> face value in making class action findings, every complaint asserting the
> requirements of Rule 23(a) or (b) would automatically lead to a certification
> order, frustrating the district court's responsibilities for taking a close look at
> relevant matters . . . for conducting a rigorous analysis of such matters . . . and for
> making findings that the requirements of Rule 23 have been satisfied . . . ."

Gariety v. Grant Thornton, LLP, 368 F.3d 356, 365 (4th Cir. 2004) (internal citations and
quotation marks omitted).

## A.     Rule 23(a)

The four requirements of Rule 23(a) are colloquially referred to as numerosity,

commonality, typicality, and adequacy of representation.

### 1.     Numerosity

In order to be certified under Rule 23(a), a class must be so numerous that joinder of all

members is impracticable.  Fed. R. Civ. P. 23(a)(1).

### 2.     Commonality

There must be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).

Under Rule 23(a), the commonality "inquiry is not whether common questions of law or fact

predominate, but only whether such questions exist." Hewlett, 185 F.R.D. at 216.  As will be

discussed, Rule 23(b)(3) imposes the more stringent requirement that common questions must predominate over any questions affecting only individual members.  For this reason, most cases analyzing a posited 23(b)(3) class bypass the commonality analysis and proceed directly to the predominance requirement.  Lienhart v. Dryvit Systems, Inc., 255 F.3d 138, 146 n.4 (4th Cir. 2001).

### 3.      Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Many consider the typicality requirement to be redundant with commonality.  Nevertheless, typicality focuses on "whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct."  Hewlett, 185 F.R.D. at 217.

### 4.      Adequacy of representation

Rule 23(a)(4) requires that the representative parties must "fairly and adequately protect the interests of the class."  This requirement is sometimes subdivided into a determination whether (i) class counsel have the qualifications and resources to prosecute the proposed litigation adequately, and (ii) the claims of the class representatives are sufficiently interrelated to and not antagonistic with the class's claims.  Hewlett, 185 F.R.D. at 218.

### B.      Rule 23(b)(3)

As stated above, a class plaintiff must, in addition to satisfying all of the prerequisites of Rule 23(a), fit within a type of class action recognized in Rule 23(b).  The plaintiffs seek certification pursuant to 23(b)(3), which requires that common issues predominate and that a

class action must be superior to other available methods of adjudication.  The subsection provides:

> The court [must] find[] that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3).

The rule also specifies four factors that the court should weigh when evaluating predominance and superiority.  They are:  (i) the strength of the individual class members' interest in controlling the prosecution and defense of a separate action, (ii) the extent and nature of existing litigation already begun by or against class members, (iii) the desirability or undesirability of concentrating the litigation in the single forum selected by the class plaintiffs, and (iv) the likely difficulties in managing the class action.

## C.      Applying the Rule 23(a) Factors

For purposes of this decision, the Court will assume that the plaintiffs have sufficiently addressed the Rule 23(a) factors.  This assumption shifts the analysis to the principal battleground under Rule 23(b)(3).

Briefly considering the 23(a) factors, the class proposed by the plaintiffs would include upwards of 68,000 members, which satisfies the numerosity requirement.  Ford does not contest this point.

Ford does, however, challenge the adequacy of representation, contending that the litigation is entirely driven by lawyer-entrepreneurs looking for a fat class action payday.  In support of this contention, Ford cites class counsels' difficulties in finding current owners willing to serve as class representatives.  Ford also points to deposition testimony from class plaintiffs that they met their counsel for the first time at the deposition and that they knew little about the

case beyond their desire to obtain a free new car.  See Paper No. 250, ex. 3, p. 30, 33; Paper No. 250, ex. 4, p. 22, 24.

Despite these contentions, plaintiffs have the better part of the argument.  Class counsel are highly experienced and have the intellectual and financial resources necessary to prosecute a sophisticated class action.  Additionally, class treatment is frequently appropriate in product liability cases when the monetary claim of any one class member is not high enough to justify individual litigation, as appears the case here.  Although plaintiffs' counsel have not provided evidence on this point, they agree that the cost to strengthen a class vehicle would likely be in the range of a few thousand dollars.  Paper No. 264, p. 116.  Absent personal injury, no individual Ford owner is likely to assume the heavy burden of suing Ford on the seatback issue.

Regarding Ford's second point, it is correct that class representatives have a duty to supervise class counsel.  Nevertheless, they need not have extensive knowledge of the facts of the case in order to serve as adequate representatives.[6]  Hence, the adequacy test is satisfied.

As mentioned *supra*, the remaining 23(a) requirements, commonality and typicality, are part and parcel of a 23(b)(3) inquiry into the predominance of common issues.  Accordingly, the Court will address them below.

**D.    Applying the Rule 23(b)(3) Factors**

Several of the enumerated 23(b)(3) factors can be addressed briefly.  As mentioned, class members do not have a strong interest in prosecuting individual actions against Ford.  Counsel have not identified any ongoing litigation with which a class action would interfere.  The parties

---

[6] The Fourth Circuit has found that

> It is hornbook law . . . that in a complex lawsuit, such as one in which the defendant's liability can be established only after a great deal of investigation and discovery by counsel against a background of legal knowledge, the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative.

Gunnells v. Healthcare Services, Inc., 348 F.3d 417, 430 (4th Cir. 2003).

have not briefed the desirability or undesirability of concentrating the seatback litigation in the

District of Maryland. Nevertheless, because the proposed class would include only Maryland

residents, the United States District Court for the District of Maryland would be a logical forum.

Thus, class certification turns on the issues of predominance, superiority, and

manageability. Predominance "tests whether proposed classes are sufficiently cohesive to

warrant adjudication by representation." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623

(1997). Plaintiffs must show that the issues they seek to litigate are ones that are "readily

susceptible to classwide proof." Broussard, 155 F.3d at 341. Plaintiffs must also demonstrate

that a given question "can be resolved for each class member in a single hearing . . . ." Thorn v.

Jefferson-Pilot Ins. Co., 445 F.3d 311, 319 (4th Cir. 2006). If, however, "resolution turns on a

consideration of the individual circumstances of each class member," then commonality and

predominance are lacking. Id.

Superiority tests whether there is another available method of adjudicating the claims that

has greater practical advantages. Stillmock v. Weis Markets, Inc., Civ. No. MJG-07-1342, 2009

U.S. Dist. LEXIS 17054, *14 (D. Md. March 4, 2009). Manageability has no simple definition.

The Court must conduct a thought experiment that envisions how a class action would unfold.

This requires a mental dress rehearsal of the anticipated proof, the jury instructions, the verdict

sheet, and the burdens imposed on the jury. Certification should not be denied merely because

the case would be complicated or protracted.[7]  When complexity would degenerate into chaos,

however, class certification must be refused. With this background in mind, let us turn to a

discussion of the facts of the case.

---

[7] See In re Antibiotic Antitrust Actions, 333 F. Supp. 278, 282 (S.D.N.Y. 1971) ("[D]ifficulties in management are of significance only if they make the class action a *less* 'fair and efficient' method of adjudication than other available techniques.").

The plaintiffs anticipate that a class action trial would be straightforward. They acknowledge the burden to prove that (i) the seats in the class vehicles are defective, meaning unreasonably dangerous, and (ii) when Ford manufactured the vehicles a feasible, alternative design was available. They contend that under Maryland law the correct test to prove defect is the consumer expectation test.

According to plaintiffs' experts, a seatback, to be reasonably safe (not defective), should not deform in a moderate speed rear-impact collision. Under their calculations, any seatback with a rigidity of less than 20,000 inch-pounds is defective. Because none of the class vehicles meets this rigidity standard, all are defective and in need of repair. Thus, to prove that the class vehicles are defective (Counts 1 and 2), plaintiffs argue that they need only establish the safety-required standard (20,000 inch-pounds), that it was feasible for Ford to have manufactured vehicles that met the standard, and that the class vehicles, as built, fall short.

To prove the other counts (Counts 3, 4, and 5), plaintiffs contend that they need only satisfy the additional elements that (i) Ford knew the seatbacks were unsafe, and (ii) Ford withheld this information from the public and regulators.[8]

On the other hand, Ford envisages a hopelessly muddled and protracted class action trial. Ford points out that the class vehicles were manufactured with twenty-three different seating system configurations involving a variety of seat frames, headrests, seatbelts, floor pan attachments, reclining mechanisms, and air bags. Ford also asserts that the appropriate test under Maryland law is not the consumer expectation test but the risk-utility test. Ford posits that the jury would be required to return a separate verdict on each of the twenty-three different

---

[8] For an expression of the formal elements of the various counts, see the Maryland Court of Appeals's opinion in Lloyd, et al. v. General Motors Corp., et al., 916 A.2d 257, 273–84 (Md. 2007). In addition, Count 6 alleges a civil conspiracy. Counsel have not briefed whether this count is viable given the bankruptcy stay that has frozen the case against Ford's alleged co-conspirators.

configurations. Ford also points out that the plaintiffs have not begun to address how, in the event of a verdict for the class, each of the configurations could be strengthened to meet the 20,000 inch-pound rigidity standard. Either the Court or the jury, it has not been decided which, would be required to approve the fix of each configuration.

With respect to Counts 3, 4, and 5, Ford notes the additional problem that the plaintiffs must prove reasonable reliance on Ford's alleged misrepresentations or non-disclosures. Reliance, Ford maintains, cannot be litigated on a classwide basis but must be proved consumer by consumer.[9]

### 1.   NHTSA and FMVSS 207

In order to choose between these conflicting positions, one must begin with a discussion of the National Highway Traffic Safety Administration ("NHTSA") and the long history of the seatback rigidity controversy. In 1966, Congress passed the National Traffic and Motor Vehicle Safety Act (the "Act"). The Act created NHTSA, which is one of the component agencies of the United States Department of Transportation. NHTSA's mission, as set by Congress, is "to save lives, prevent injuries, and reduce traffic-related health care and other economic costs." Paper No. 247, ex. 8, p. 1.

Pursuant to the Act, NHTSA has the authority to set safety standards for automobiles sold in the United States. These standards are referred to as the Federal Motor Vehicle Safety Standards ("FMVSS"). They are divided into three series. The 100 series addresses crash avoidance. The 200 series addresses crashworthiness. The 300 series addresses post-crash fire related injuries. Manufacturers are required to certify that their vehicles meet the standards.

To achieve nationwide uniformity of automobile safety standards, the Act contains a provision that preempts the states from legislating in this area. 49 U.S.C. § 30103(b)(1). As

---

[9] Plaintiffs maintain that reliance can be presumed in cases involving the failure to disclose important information.

stated by the Supreme Court, the provision "reflects a desire to subject the industry to a single, uniform set of federal safety standards." Geier v. American Honda Motor Co., 529 U.S. 861, 871 (2000).

The Act's preemption provision does not prohibit common law tort claims, however.  A "savings clause" provides that "compliance with" a federal safety standard "does not exempt a person from liability at common law."  49 U.S.C. § 30103(e).  The instant action, therefore, is not expressly preempted by federal law.

In 1967, NHTSA issued FMVSS 207, which addresses seating systems.  49 C.F.R. § 571.207.  *Inter alia*, FMVSS 207 "establishes requirements for seats, attachment assemblies, and installation, to minimize the possibility of failure as a result of forces acting on the seat in vehicle impact."  Significantly, it requires that seatbacks must provide 3,300 inch-pounds of resistance and 20 times the empty seat weight for a rear-impact collision.[10]

In 1989, Dr. Kenneth Saczalski and Mr. Alan Cantor, who serve as plaintiffs' experts in the instant case, filed separate petitions with NHTSA requesting the agency to increase the seatback rigidity standard from 3,300 inch-pounds to 56,000 inch-pounds.  57 Fed. Reg. 54958 (Nov. 23, 1992); 54 Fed. Reg. 40896 (Oct. 4, 1989).  In response to their petitions, NHTSA opened a rulemaking proceeding to consider their requests.

As part of this process, NHTSA received comments from a host of interested parties, including academics and auto manufacturers, both foreign and domestic. The agency conducted its own crash tests and retained independent researchers, including the Johns Hopkins Applied Physics Laboratory, to analyze field accident data and conduct dynamic sled testing of seats and seat mock-ups.

---

[10] The terminology used in FMVSS 207 is "373 newton-meters moment," which translates to a rigidity of 3,300 inch-pounds.  For ease of reference, this opinion will also use the inch-pound metric.

In 2004, NHTSA terminated the rulemaking without modifying the 3,300 inch-pound standard. In its notice, the agency wrote that "improving seating system performance is more complex than simply increasing the strength of the seatback." 69 Fed. Reg. 67068, 67069 (Nov. 16, 2004). The agency explained that further studies were needed to enable it to determine the proper balance between seatback strength and other vehicle attributes.

> A proper balance in seatback strength and compatible interaction with head restraints and seatbelts must be obtained to optimize injury mitigation. Comprehensive information needed to determine that proper balance is not available, although there has been work on pieces of the problem.
>
> ....
>
> Although the agency has a better understanding of the issues associated with seat performance in rear impacts at various speeds, further studies are needed to allow NHTSA to develop a proposed upgrade to FMVSS No. 207 that will effectively balance seatback strength and interaction with other vehicle attributes.

Id.

Because NHTSA declined to change FMVSS 207, vehicles sold in the United States must meet, and are not legally required to exceed, the 3,300 inch-pound threshold. All of the class vehicles exceed this standard. Seatback rigidity in the class vehicles ranges from 10,000 to 17,000 inch-pounds. Because of the Act's "savings clause," however, Ford's compliance with FMVSS 207 does not preempt plaintiffs' claim that the seats are defective.

Although the Act does not bar the instant suit, one must recognize that the practical effect of a class victory would be to re-write FMVSS 207. Assuming a class victory, any car owned by a Maryland resident that fell short of the 20,000 inch-pound standard would be defective. In order to continue selling cars in Maryland, automobile manufacturers would be required to increase seatback rigidity in all new cars to at least 20,000 inch-pounds. Because the automobile market is national, this means that 20,000 inch-pounds would become the new

nationwide standard.  In effect, therefore, a jury would supplant NHTSA on the issue of seatback

rigidity.  In so doing, the jury would be exercising a rule-making power forbidden to the states.[11]

Although these points do not by themselves preclude a class action, they are powerful arguments

against class certification.

### 2.      The risk-utility test and the twenty-three seating system configurations

In testing the manageability of a class action, the Court must mentally dress rehearse the

trial proposed by the parties.  The plaintiffs posit a simple case-in-chief in which their experts

would establish that the 20,000 inch-pound standard is required for reasonable safety, that the

class vehicles fall short of this standard, and that feasible alternative designs were available to

Ford.  This evidence, class counsel propose, would satisfy the consumer expectation test.

Under the case law, the Court, when testing predominance and manageability, is required

to consider the defenses as well as the claims.[12]  Ford posits a far more complicated defense case

that addresses, seriatim, the crashworthiness of the twenty-three seating systems found in class

vehicles.  Among other consequences, the jury would be required to return twenty-three separate

verdicts stating, configuration-by-configuration, whether each was defective.

While the Court has substantial authority to streamline a trial, a class action is a

procedural device designed to achieve efficiency.  Its employment cannot unfairly abridge the

rights of the parties.  Thus, the Court must decide whether fairness entitles Ford to present the

defense it pictures.

---

[11] As is discussed *infra*, an adverse verdict in an individual personal injury suit does not require a manufacturer to redesign its automobiles.

[12] A predominance inquiry must include "consideration of how a trial on the merits would be conducted."  Chin v. American Tobacco Co., 84 F.3d 734, 740 (5th Cir. 1996).  "Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues."  Id. at 744.  See also Gunnells v. Healthplan Services, Inc., 348 F.3d 417, 438 (4th Cir. 2003); Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 342 (4th Cir. 1998).

In deciding this issue, the Court must first determine the proper product liability test to apply under Maryland law.  Although Maryland courts have used both the consumer expectation and the risk-utility tests in product liability cases, the Court concludes that the risk-utility test is appropriate here.

The leading Maryland case is <u>Ziegler v. Kawasaki Heavy Industry, Ltd.</u>, 539 A.2d 701 (Md. Ct. Spec. App. 1988).  Zeigler, who had been seriously injured in a motorcycle accident, sued Kawasaki.  He alleged that his motorcycle was defective because its frame did not include a structure designed to protect a rider's legs in a crash.  Maryland's intermediate appellate court stated that in a strict liability case the plaintiff must prove that "the product was in a defective condition *and* unreasonably dangerous at the time the product was sold."  <u>Id.</u> at 704.

The Kawasaki court discussed the differences between the two product liability tests. When a product malfunctions as the result of a manufacturing error, the consumer expectation test is appropriate. When the product functions as intended, but the plaintiff alleges that the design is unreasonably dangerous, the risk-utility test is applicable.  Thus, the risk-utility test is to be used in design defect cases.

> In a design defect case that is not included in the limited category of inherently unreasonable risks, the issue turns into whether a manufacturer, knowing the risks inherent in his product, acted reasonably in putting it on the market.  The question of the alleged defects then depends on the balancing of the utility of the design and other factors against the magnitude of that risk.

<u>Id.</u> at 705 (citations omitted).

Federal product liability cases alleging design defects have fallen in line behind the risk-utility test.[13]

The risk-utility test has seven factors:

---

[13] <u>See, e.g.</u>, <u>Shreve v. Sears, Roebuck & Co.</u>, 166 F. Supp. 2d 378, 411 (D. Md. 2001); <u>Tannebaum v. Yale Materials Handling Corp.</u>, 38 F. Supp. 2d 425, 431 (D. Md. 1999).

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

Id. at 706–07.

To return a verdict in this case, the jury would be required to apply the seven factors to the class vehicles. One must ask whether the jury would apply them to one thing, the proposed 20,000 inch-pound standard, or to twenty-three things, the different configurations. Predominance and manageability turn on the answer to this inquiry.

The Court finds that, in applying the risk-utility test, the jury would be required to address each of the twenty-three configurations. This conclusion is reached by a careful consideration of the test's requirements, NHTSA's findings on the issue of seatback rigidity, the expert reports, and the rest of the extensive record.

A reading of the risk-utility factors is an appropriate starting place. Several are inapplicable (e.g., the user's ability to avoid danger) or address the general utility of motor vehicles (e.g., the product's usefulness to the public as a whole). Others, however, would focus

the jury's attention on the individual seating systems (e.g., the safety aspects of the product, the availability of a suitable substitute, the manufacturer's ability to make the product safer without sacrificing its functionality, and the costs involved).

Turning to NHTSA, one finds clear support for a configuration-by-configuration approach.  The agency, despite years of study, could find no clear-cut rationale for increasing seatback strength.  As mentioned, NHTSA's termination notice stated that "improving seating system performance is more complex than simply increasing the strength of the seatback."  Moreover, according to NHTSA, "optimizing injury mitigation" requires striking a proper balance between seatback strength "and compatible interaction with head restraints and seatbelts."  69 Fed. Reg. 67068, 67069 (Nov. 16, 2004).  To strike a proper balance, the jury would be required to analyze the compatible interaction between seats of varying strengths and design and a variety of head restraints, seatbelts, and airbag combinations.  Using NHTSA's methodology, each configuration must be separately addressed.

Next, Ford's expert witnesses offer a strong rationale for a disaggregated approach.  Dr. David Viano, who holds a Ph.D. in Applied Mechanics and a M.D., opines that increasing seatback rigidity is not an unalloyed safety blessing.[14]  While a rigid seat may be a benefit in certain types of crashes, or to passengers with certain characteristics, a rigid seat may be disadvantageous in other contexts.  In his report, Dr. Viano offers examples.  He explains that Ford's seats are designed to absorb forces in a collision by yielding.  In a front-impact collision, unbelted passengers in the second row will be thrown against the back of the front seat.[15]  If the front seat yields to the forward blow, the impact will be softened.  If the front seat is too stiff, the unbelted passenger will hit an unyielding wall.  The same analysis applies when a high speed

---

[14] Dr. Viano worked at the General Motors Research Laboratories as a research scientist for 29 years.  He currently owns a consulting firm.
[15] Safety data show that many people still do not wear seatbelts.

rear-impact collision forces a belted second row passenger, often a child in a car seat, into the back of the front seat.

Dr. Viano further reports that a young, healthy person sitting in proper alignment may benefit from a more rigid seat in a moderate speed rear-impact collision. Even in low speed rear-impact crashes, however, a more rigid seat poses an increased risk of disabling spinal injury to elderly passengers and others with fragile spines. Moreover, stiff seats pose greater risk to front seat occupants who are "out of position" when hit from behind. Persons are out of position, for example, if they are reaching for the radio or twisting around to talk to a back seat passenger.

Dr. Viano also explains that rigid seats have safety drawbacks for front seat occupants in a rear-impact collision. Such an impact will force the occupant backward in the seat. If the seat does not yield, the occupant will rebound violently forward in the same manner that a tennis ball rebounds off a tightly strung racquet.[16]

Thus, choosing a minimum seatback rigidity standard is a complicated undertaking. Requiring the jury to evaluate the differences among the twenty-three configurations would further complicate its task. The different configurations vary materially in terms of design and functionality. For instance, the front seats in two-door models tip forward to allow passengers to gain entry to the back seats. The front seats of four-door models do not tip forward. In some models, the front seat is a continuous bench. Other models offer front bucket seats. Some seats adjust manually, while others are powered. The frames of some seats are fashioned from bent metal tubes welded together. The frames of others are stamped from a single piece of metal. Some headrests are adjustable, while others are one piece. The seats vary in terms of weight, volume, padding, and strength. Some seats have a single reclining mechanism. Others have a

---

[16] The experts also cite other instances in which rigid seats pose a greater risk of injury.

dual system.  There are other differences, and all of them influence the crashworthiness of the vehicles in which they are found.

The characteristics of the people who use class vehicles also factor into the safety equation.  The size, age, and sex of the customary occupants are important variables.  In an accident, the forces exerted on a 220 pound male are significantly different from those exerted on a 115 pound female.[17]  A seat that the former would consider yielding might be considered rigid by the latter.  A seat that is appropriate for a person in the prime of life might be less suitable for an elderly person.  It is also important to know whether the owners and their family usually drive in the city at low speeds or on the interstate at high speeds.  Some owners almost always drive alone, meaning that rear passenger safety is a secondary consideration for them.  Others often transport children in car seats.  An individualized inquiry into these considerations is customary in a single personal injury case, but would be impossible in a class action.

Under the risk-utility test, the jury must also evaluate "the manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility."  Kawasaki, 539 A.2d at 706.  During oral argument, plaintiffs' counsel conceded their obligation to prove that a feasible, cost-effective, alternative design existed when the vehicles were built.  Paper No. 275, p. 4.  In a class action trial, plaintiffs would be obliged to discharge this responsibility for each of the twenty-three configurations.[18]

If a jury found that the class vehicles were defective, the Court would be confronted by yet another complex problem.  In Lloyd, the Maryland Court of Appeals envisioned that the class vehicles would be repaired and that the class members would not simply be awarded money.  At oral argument, counsel could not agree whether responsibility for designing repairs for the class

---

[17] During crash testing, the weight of the dummy is an important variable.
[18] For example, for two-door Explorer models, the plaintiffs would be required to show that Ford could have designed a seat that met the 20,000 inch-pound standard and also tipped forward to permit access to the rear seats.

vehicles would fall to Ford or to the plaintiffs.  The parties did not brief the issue, and the Court

has not decided it.  Regardless of the answer, deciding whether the class vehicles are repairable

would require a configuration-by-configuration analysis.[19]

Two other factors in the risk-utility test raise serious predominance and manageability

problems.  First, the jury must consider "the user's anticipated awareness of the dangers inherent

in the product and their avoidability, because of general public knowledge of the obvious

condition of the product, or of the existence of suitable warnings or instructions."  Kawasaki, 539

A.2d at 707.  Second, the jury must address "the availability of a substitute product which would

meet the same need and not be as unsafe."  Kawasaki, 539 A.2d at 706.

The first issue might be susceptible to a classwide approach, asking what the general

public knew about seatback safety.  The second issue, however, is less amenable to a classwide

approach because one must ascertain the reasons why individual class members purchased

particular Ford models.  For any class member, this would require examining family size, the

ages of children, the length of any commute, the family budget, and many other individualized

factors.  As part of the test, one must also determine whether there were other vehicles on the

market (substitute products) that would meet the same needs and not be as unsafe.

Were this case to proceed as a class action, therefore, the jury would be required to make

two or perhaps three separate findings for each of the twenty-three configurations:  safety of the

seating system, feasible alternative design, and feasibility of repair.  The complexity of this task

makes the proposed class action unmanageable and demonstrates that individual rather than

---

[19] A stronger seat likely means a heavier seat and a reinforced floor pan.  Fixing the class vehicles probably requires adding weight, thereby decreasing fuel economy and placing greater demands on the brakes.  One can envision the difficulties involved in deciding this issue in the context of litigation.  Such decisions are best left to a regulatory body, in this case NHTSA.

common issues predominate.  Thus, the class action fails to satisfy the predominance and manageability requirements.

### 3.    Other considerations

Other factors militate against class treatment.  Counts 3, 4, and 5 are misrepresentation counts that require plaintiffs to prove reliance:

> Count 3:  negligent failure to disclose, failure to warn, concealment, and
>
> misrepresentation;
>
> Count 4:  fraudulent concealment and intentional failure to warn; and
>
> Count 5:  unfair or deceptive trade practices under the Maryland Consumer Protection
>
> Act.

The plaintiffs contend that reliance may be presumed in a case involving the concealment or omission of important facts.  Paper No. 243, p. 21–23.  The plaintiffs' position presupposes that information about seatback safety was hidden from the public.  Ford disagrees, pointing out that the seatback strength issue has been a matter of public debate since 1989, two years before the earliest class vehicles hit dealerships.  In that year, Dr. Saczalski and Mr. Cantor filed their petitions with NHTSA.  In response, the agency opened a rulemaking proceeding that was a matter of public record.  In 1992 and 2001, the television program *60 Minutes* featured segments on the seatback rigidity issue.  The instant class action was filed in 1999 before some of the class vehicles were manufactured.

Ford contends that it is entitled to inquire of each class member whether they were aware of this publicity before they purchased their Ford vehicle.  The Court agrees.  In the <u>Lloyd</u> opinion, the Maryland Court of Appeals expressly listed reliance as an element that the plaintiff

must prove in the three misrepresentation counts.[20]   Because a class action is merely a procedural

device, a class action trial may not abridge a defendant's rights in the name of expediency.

Relieving plaintiffs of their burden to prove reliance would constitute such an abridgement.[21]

The denial of class certification does not leave the class members without a remedy.   An

individual class member could bring suit in Maryland state court asserting the same causes of

action, including economic loss, stated in the Fifth Amended Complaint.   Although the cost of

bringing the suit would be high, a successful plaintiff could recover costs and attorney's fees

under the Maryland Consumer Protection Act.   While the Court is not insensitive to the practical

difficulties facing an individual plaintiff in bringing an economic loss suit, an avenue of redress

is nonetheless available.[22]

Class members may also bring personal injury suits.   A number of seatback rigidity

personal injury suits have been litigated in other jurisdictions.[23]   The large amount in controversy

gives attorneys the incentive to take such cases on a contingency fee basis.   In several of these

cases, Dr. Saczalski has testified as an expert for the plaintiffs.

From the Court's perspective, these personal injury cases have distinct advantages over a

class action.   The proposed class action centers on the 20,000 inch-pound standard as the

platonic ideal for seatback strength.   The proof would mirror the generalized evidence that

---

[20] See also In re Medimmune, Inc. Securities Litigation, 873 F. Supp. 953, 968 (D. Md. 1995) ("The most prominent distinction between common law fraud and a 10(b)-5 violation is that the latter permits recovery based on a 'fraud on the market' theory which presumes reliance, while the former requires proof of actual reliance.").
[21] Although the parties have not briefed this issue, Ford might also be entitled in discovery to test the extent to which safety is a concern to individual class members.   This could be done, for example, by asking them whether they drive a motorcycle or an ATV, or a very light vehicle such as a Smart Car.
[22] Unlike a class action, an individual suit could not preempt NHTSA by setting a new industry standard.
[23] Tangentially, the parties have debated whether a Ford verdict would prejudice class members who subsequently sustained a personal injury.   If Ford prevailed, a class member would be collaterally estopped in subsequent litigation from asserting a seatback defect based on the strength issue.   Thus, a class member who has only a few thousand dollars to gain in the instant litigation might forfeit a substantial personal injury suit in the future. Although this potential prejudice would not by itself preclude certification, it adds weight to the Court's decision against certifying the class proposed by plaintiffs.

NHTSA amasses when setting a FMVSS standard.  The proof would not be tethered by the record of an actual crash involving real people injured while riding in a particular vehicle.

A personal injury case is a better forum for litigating the safety of a vehicle's seating system.  This observation is borne out in Dr. Saczalski's testimony in <u>Grimes v. Ford Motor Company</u>, CA 02-08749 AH (Fla. Cir. Ct. May 31, 2007).  To get a clearer picture of the trial of a seatback case, the Court requested the parties to supply record excerpts from actual cases, including expert testimony, jury instructions, and verdict sheets.  Among their responses, the parties submitted Dr. Saczalski's testimony in three cases: <u>Grimes</u>; <u>Flax v. DaimlerChrysler Corp.</u>, No. 02C-1288 (Tenn. Cir. Ct. Nov. 24, 2004); and <u>Carrillo v. Ford Motor Co.</u>, 94 L 16931 (Ill. Cir. Ct. Oct. 27, 1999).

Donna Grimes was severely injured while a passenger in a 2000 Ford Explorer that was struck from behind in a moderate speed collision.  In that single case, Dr. Saczalski's testimony covered 224 pages of transcript.  His opinion went beyond the argument that the seat was defective because it failed to meet the 20,000 inch-pound standard.  He opined that the seat suffered a "catastrophic failure."  He testified that the impact broke the seat's front cross member and fractured the gear teeth in the reclining mechanism.  Once these parts gave way, the seat collapsed backwards, precipitating Ms. Grimes head first into the rear compartment. Testimony of Dr. Saczalski at 84–85, 88, 113, <u>Grimes v. Ford Motor Co.</u>, CA 02-08749 AH (Fla. Cir. Ct. May 31, 2007).

In <u>Grimes,</u> therefore, the expert testimony was informed by the details of a specific accident.  In the proposed class action, the proof would not be so grounded.  Instead, it would savor of the academic testimony before a regulatory agency.  The proposed class action would, therefore, deviate from the postulate that a trial produces the most accurate result when

adversaries litigate the particular facts of an actual event.   Moreover, a personal injury suit will not usurp NHTSA's rule-making authority because the verdict will not establish a design criterion for vehicles.

## IV.    CONCLUSION

For these reasons, the proposed class action fails to meet the requirements of predominance, superiority, and manageability.  Accordingly, the Court will, in a separate Order, DENY class certification.  The Court will ask plaintiffs whether they wish to attempt to narrow the class or to pursue another alternative.

Dated this 12th day of March, 2010.

Benson Everett Legg
United States District Judge