IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| TIMOTHY LLOYD, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | CIVIL NO. L-07-2487 |
| GENERAL MOTORS CORPORATION, *et al.*, | * | |
| Defendants. | * | |

## **Memorandum**

Now pending is the Plaintiffs' Renewed Motion to Certify Class. Docket No. 288. The issues have been fully briefed, and on January 21, 2011 and February 7, 2011, the Court held a hearing. For the reasons stated herein, the Court will, by separate Order, DENY the Motion.

### I. BACKGROUND

This opinion considers the Plaintiffs' second effort to certify a class. Their first proposed class included all Maryland residents who own Ford Explorers, Mercury Mountaineers, or Ford Windstars for certain model years. Plaintiffs allege that the seats in the class vehicles are defective because they are prone to collapse rearward in moderate speed rear-impact collisions. Then as now, the Plaintiffs sought to recover not for personal injuries, but, rather, money damages in an amount necessary to strengthen the seats.

The Court declined to certify the original class in an opinion dated March 12, 2010 ("Lloyd 1"). That opinion laid out the procedural history of this litigation, the pertinent facts, and the reasons why the proposed class did not satisfy Rule 23. Docket No. 276; 266 F.R.D. 98

1

(D. Md. March 12, 2010). These points need not be restated here in detail. In brief, the Court's reasoning centered on three factors that would have made the class action trial unworkable.

First, the trial would have placed an impossible burden on the jury. Maryland's risk-utility test calls on the jury to make two determinations. The jury must initially assess the safety performance of the product. Then, the jury must decide whether a feasible, safer alternative design existed. The two steps are required because a product is not defective simply because it poses a risk of injury. Many useful and necessary products pose risks. A product is defective only if the danger presented by the product outweighs its utility. Investigating this balance inevitably leads the jury to focus on whether foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller.

Had the Court certified the proposed class, the jury would have been required to apply the risk-utility test to vehicles incorporating 23 different seating configurations. A seat's performance in a crash depends on the interplay of the components of the entire seating system. The variables include, <u>inter alia</u>, vehicle weight, seatback rigidity, headrest type, reclining mechanism, and the seat's anchoring system. The jury would have been confronted with the hopeless task of (i) evaluating the crashworthiness of all 23 systems, and (ii) deciding for each whether a feasible alternative design existed.

Second, the trial would have required the jury to usurp the standard-setting prerogative of the National Highway Transportation Safety Administration ("NHTSA"). The Plaintiffs argued that a vehicle is defective unless its seats have a minimum seatback strength of 20,000 inch-pounds.[1] NHTSA, however, requires only 3,300 inch-pounds.[2] Moreover, in 1989, NHTSA

---

[1] The verdict sheet would have requested the jury to return a special verdict stating whether they accepted or rejected this contention.

rejected a request, submitted by Plaintiffs' experts in this case, to increase the minimum requirement to 56,000 inch-pounds. After studying the issue for nearly 15 years, NHTSA declined, reporting that "improving seating system performance is more complex than simply increasing the strength of the seatback." 69 Fed. Reg. 67068, 67069 (Nov. 16, 2004).

Plaintiffs would have asked a lay jury, unaided by the agency's expertise, special knowledge, and ability to test, to overrule NHTSA by declaring defective any seatback below the 20,000 inch-pound threshold. Moreover, because the market for new cars is nationwide, a verdict in favor of the class may have effectively imposed a new nationwide 20,000 inch-pound standard for new vehicles.

Third, the Complaint included counts alleging negligent failure to disclose, fraudulent concealment, and deceptive trade practices, three causes of action for which a purchaser's reliance must be proved. As the Court ruled, such an individualized inquiry is not susceptible of class treatment.

For these and other reasons, the Court declined to certify the proposed class. Plaintiffs' counsel requested leave to propose a reformulated class. On July 28, 2010, the Plaintiffs filed the Motion now under consideration. They have narrowed the proposed class significantly, naming only Maryland residents who own a model year 1998 to 2001 4-door Ford Explorer or Mercury Mountaineer with sport bucket seats. This, they contend, reduces the analysis from 23 seating configurations to one, and the resulting trial would, therefore, be manageable. Additionally, Plaintiffs have abandoned the negligent failure to disclose, fraudulent concealment, and deceptive trade practices counts of their Complaint, leaving only claims for negligence and strict products liability.

---

[2] The standard articulated in FMVSS 207, the standard dealing with seating systems, is "373 newton-meters moment," which translates to a rigidity of 3,300 inch-pounds. As in Lloyd 1, this opinion will use the inch-pound metric for ease of comparison.

3

## II. DISCUSSION

### a. Rule 23 Requirements

A proposed class must meet all of the requirements of Rule 23(a) and fit within one of the subsections of Rule 23(b). As the Court determined in its first opinion, Plaintiffs satisfy all of the requirements of Rule 23(a).[3] The motion, therefore, turns on the ability of the proposed class to meet the terms of Rule 23(b)(3), the specific provision on which certification is sought.

Rule 23(b)(3) provides: "The court [must] find[] that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The rule also specifies four factors that the court should weigh when evaluating predominance and superiority. They are: (i) the strength of the individual class members' interest in controlling the prosecution and defense of a separate action, (ii) the extent and nature of existing litigation already begun by or against class members, (iii) the desirability or undesirability of concentrating the litigation in the single forum selected by the class plaintiffs, and (iv) the likely difficulties in managing the class action.

As before, three of the four factors enumerated in the rule favor the Plaintiffs. Individual class members have little interest in prosecuting a separate action. Any individual recovery, which Plaintiffs' attorneys estimate at a few thousand dollars, would be dwarfed by the cost of bringing the suit. The class action rule was designed to meet such situations by allowing

---

[3] In opposing class certification, Ford again challenges the adequacy of the named Plaintiffs to represent the class. Ford again argues that this suit is driven by entrepreneurial class action attorneys rather than aggrieved citizens seeking redress. Focusing on what it terms a "revolving door" of named Plaintiffs, Ford observes that certification of the new proposed class would require wholesale substitution of the named Plaintiffs, since no current named Plaintiff owns one of the class vehicles. This is a concern worth discussing. Because so many Plaintiffs have come and gone, it is evident that class counsel, rather than the named Plaintiffs, are in control of the litigation. Nevertheless, the rule does not require the named Plaintiffs to have extensive knowledge of the facts and history of the case, especially when, as is the case here, class counsel are highly experienced and sophisticated.

aggrieved plaintiffs to aggregate their claims, thereby making it economical for an attorney to take their case. The class action would not interfere with any existing litigation because there are no other seatback strength cases already begun by class members. Finally, because the proposed class is composed of Maryland residents, concentrating the litigation in this district would be appropriate.

With this in mind, the Court turns to manageability and aspects of predominance and superiority not listed in the Rule. Predominance, which includes manageability, "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623 (1997). Plaintiffs must show that the issues they seek to litigate are ones that are "readily susceptible to classwide proof." Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 341 (4th Cir. 1998). Plaintiffs must also demonstrate that a given question "can be resolved for each class member in a single hearing . . . ." Thorn v. Jefferson-Pilot Ins. Co., 445 F.3d 311, 319 (4th Cir. 2006). If, however, "resolution turns on a consideration of the individual circumstances of each class member," then commonality and predominance are lacking. Id.

Superiority tests whether there is another available method of adjudicating the claims that has greater practical advantages. Stillmock v. Weis Markets, Inc., Civ. No. MJG-07-1342, 2009 U.S. Dist. LEXIS 17054, *14 (D. Md. March 4, 2009).

In order to apply the tests, the Court must envision how a class action would unfold. This requires a mental dress rehearsal of the anticipated proof, the jury instructions, the verdict sheet, and the burdens imposed on the jury. Certification should not be denied merely because the case would be complicated or protracted. When complexity would degenerate into disorder, however, class certification must be refused.

5

### b. Products Liability Test

Before continuing with the Rule 23(b)(3) analysis, however, the Court must first address the proper products liability framework. Two product liability tests exist under Maryland law: the consumer expectation test and the risk-utility test. In Lloyd 1, the Court held that the risk-utility test applies to Plaintiffs' claims. This holding was fateful because the risk-utility test significantly raised the burden on Plaintiffs to show predominance and manageability. In their renewed motion, Plaintiffs vigorously urge the Court to reconsider and use the consumer expectation test. This issue requires a careful analysis.

The consumer expectation test asks whether the product was in a defective condition at the time it was sold. A defective condition is one "not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." Halliday v. Sturm, Ruger & Co., 368 Md. 186, 193 (2002). A product is unreasonably dangerous if it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it with the ordinary knowledge common to the community as to its characteristics." Id.

The risk-utility test asks "whether a manufacturer, knowing the risks inherent in the product, acted reasonably in putting it on the market." Ziegler v. Kawasaki Heavy Indus., Ltd., 74 Md. App. 613, 621 (1988), cert. denied 313 Md. 32 (1988). The test, therefore, shifts the focus from the consumer to the manufacturer of the product. A product is defective in design when the foreseeable risk of harm could have been reduced or avoided by the adoption of a reasonable alternative design. It is the omission of the reasonable alternative design that renders the product not reasonably safe. See Halliday, 368 Md. at 195.

The risk-utility test increases the burden on the jury. Under the consumer expectation test, the jury need only decide what performance and safety a reasonable consumer would expect

from the product. Under the risk-utility test, the jury must balance the utility of the product against the magnitude of the risk. Significantly, they must also decide whether alternative designs posited by the Plaintiffs would have been preferable and feasible.

In <u>Lloyd 1,</u> the Court chose the risk-utility test on the strength of the reasoning in <u>Kawasaki</u>. In that case, the Maryland Court of Special Appeals, Maryland's intermediate appellate court, applied the risk-utility test in a motorcycle crash case. <u>See</u> 74 Md. App. at 632. The plaintiff claimed that his motorcycle had been defectively designed because it lacked a structure to protect his legs in an accident. <u>Id.</u> at 615.

Plaintiffs contend that a more recent case from Maryland's highest court, the Court of Appeals, calls into question <u>Kawasaki</u>'s choice of the risk-utility test. According to Plaintiffs, <u>Halliday v. Sturm, Ruger & Co., Inc.</u>, <u>supra</u>, stands for the proposition that in any case in which the product has not malfunctioned, the consumer expectation test is required. Because the seatbacks have not malfunctioned, they argue, the Court should have applied the consumer expectation test. The Court disagrees. An analysis of <u>Halliday</u> is instructive.

In <u>Halliday</u>, a three-year-old child shot and killed himself while playing with his father's handgun. The plaintiffs contended that the gun was defectively designed because it failed to incorporate a child safety feature. Applying the consumer expectation test, the Court of Appeals found in favor of the manufacturer. The court reasoned that the gun did not malfunction, but, rather it "worked exactly as it was designed and intended to work and as any ordinary consumer would have expected it to work. The gun is a lawful weapon and was lawfully sold." 368 Md. at 208. The blame for the tragedy lay with the father for leaving the gun where the child could find it, stated the Court of Appeals.

7

During its analysis, the Halliday court criticized the Court of Special Appeals for using the risk-utility test in several cases, including Kawasaki, in which the alleged defect was the failure to include a safety feature. In so doing, the Court of Appeals reiterated its holdings from an earlier gun case, Kelly v. R.G., Industries, Inc., 304 Md. 124 (1985). "The holdings in Kelly, that the risk-utility test does not apply to a design defect case unless the product malfunctions in some way and that a handgun does not malfunction when it shoots a bullet into a person in whose direction it is fired, remain the law of Maryland." 368 Md. at 200.

Kelly also involved a handgun that operated as intended. The plaintiff, Olen Kelly, was injured when he was shot in a robbery attempt. He sued the manufacturer, claiming that the gun, a so-called "Saturday Night Special," was abnormally dangerous. He claimed that this type of gun, because it was cheap, easily concealable, and primarily suited for criminal activity, was defective because it had no legitimate purpose. The Court of Appeals ruled that a handgun manufacturer cannot be held liable under the consumer expectation test, which was applicable because the handgun had not malfunctioned. In firing a bullet, the handgun had operated as intended and as a consumer would expect. Handguns, reasoned the court, are dangerous and designed to inflict harm.[4]

Notwithstanding Halliday's criticism of Kawasaki, the Court of Appeals would not expect this Court to apply the consumer expectation test in the instant case. First, it bears noting that both Kelly and Halliday were handgun cases and involved a product designed to inflict harm on humans and, therefore, cause harm without malfunctioning. Handguns have no applicability to motor vehicles.

---

[4] "[A] handgun is not defective merely because it is capable of being used during criminal activity to inflict harm. A consumer would expect a handgun to be dangerous, by its very nature, and to have the capacity to fire a bullet with deadly force. Kelly confuses a product's normal function, which may very well be dangerous, with a defect in a product's design or construction." 304 Md. at 136 (emphasis in original).

8

Second, the Court of Appeals characterized both Halliday and Kawasaki as safety device cases.[5] The issue in Halliday was whether handguns should have child safety devices to prevent them from being used by children. The issue in Kawasaki was whether a motorcycle should have a protective cage to guard a rider's legs.

This is not a safety device case. It would be pointless to ask whether a reasonable consumer would or would not expect a seatback to deform backwards in a moderate speed rear-impact collision. Any reasonable consumer would want to know the safety tradeoffs involved in making the seatbacks more rigid. A reasonable consumer would also want to know whether potentially safer alternative designs were technologically feasible, cost-effective, and available when the vehicles were manufactured. These inquiries lie at the very heart of the risk-utility test.

### c. Plaintiffs' New Proposed Class

The Plaintiffs' narrowed class eases several of the problems that prevented certification of the prior class. Most notably, the number of seating configurations has been reduced from 23 to one, significantly narrowing the scope of the inquiry. A jury would no longer be charged with the impossible task of applying the risk-utility test to 23 separate systems. Because the seats in

---

[5] Kawasaki involved the absence of an arguable safety device, a structure to protect the rider's legs. A safety device is one that could be added to an existing product for the purpose of preventing a foreseeable injury, such as a trigger lock on a gun or a child-proof cap on a gasoline canister. See Simpson v. Standard Container Co., 72 Md. App. 199 (1987). By definition, safety devices make the product safer. The issue in such cases is whether the addition of a safety device is necessary to make the product as safe as an ordinary consumer would expect it to be. The analysis changes when the proposed addition has the potential to make the product as a whole less safe than before. As the Kawasaki court noted,

> [t]here was not sufficient evidence that the injuries sustained would have been lessened because of the presence of a protective device. Indeed, the overwhelming evidence was to the contrary. Even if we were to assume, arguendo, that the evidence was sufficient to create a prima facie case insofar as the leg injury, standing alone, was concerned, that evidence would not be sufficient to permit an inference that a motorcycle with robust leg bars would be safer with respect to the rest of the operator's body. One cannot eliminate the risk of injury to the leg at the expense of a significantly increasing risk of injury to other parts of the body.

74 Md. App. at 627. Kawasaki, therefore, differs from other safety device cases. In any event, the instant case involves not merely the proposed addition of a structure like a trigger lock or a protective crash cage. It involves the strengthening of a component of an overall seating system. Thus, characterizing Kawasaki as a safety device case does not compel the adoption of the consumer expectation test here.

the new proposed class are substantially identical, the risk-utility analysis would only have to be conducted once.

Additionally, the Plaintiffs are no longer arguing that any seatback failing to meet a 20,000 inch-pound standard is defective. They are instead asking the jury to determine whether the seatbacks in a single seating system are insufficiently rigid to be reasonably safe. This change lessens the risk that a finding of liability would set a new nationwide standard, one that NHTSA explicitly declined to adopt.

Finally, the Plaintiffs have offered to drop their fraud and negligent misrepresentation claims, thereby eliminating the need to determine each purchaser's reliance on Ford's allegedly false safety representations. This concession removes a class action stumbling block discussed in Lloyd 1.

Despite these changes, however, the Plaintiffs' new proposed class still fails the tests of manageability and superiority. The jury, as before, would be confronted with an intimidating task. In order to apply the risk-utility test, the jury would have to shoulder two burdens. First, jurors would need to understand the safety performance of the seating system as built. This would, in turn, require them to understand fully the manner in which the seating system protects or fails to protect passengers of different ages, weights, and sizes in different types of crashes at different speeds. Second, after assessing the safety performance of the system as-built, the jury would be required to determine whether there was a feasible alternative design available to the manufacturer when the cars were built. This inquiry would require the jury to hypothesize changes to the seating system to determine whether it could have been differently designed in a way so as to make the cars safer overall. If so, the jury would next be required to determine whether the redesigned system could have been manufactured at a reasonable cost with the

technology available. If the jury decided, after applying the risk-utility test, that the seating system was defectively designed, they would next be called upon to determine whether the seating system could be repaired or strengthened to make it safer.

Were the class to be certified, the jury would effectively be asked to duplicate the analysis that NHTSA undertook between 1989 and 2004, and to reach a different result. After years of study, NHTSA concluded that the data did not support an increase in the seatback rigidity standard. Though they no longer press for a 20,000 inch-pound minimum, Plaintiffs are still asking the jury, in essence, to overrule NHTSA. Such a result would run afoul of the preemption provision of the National Traffic and Motor Vehicle Safety Act ("the Act"). See 49 U.S.C. § 30103(b)(1). In order "to subject the industry to a single, uniform set of federal safety standards," Congress specifically preempted states from legislating in the area of automobile safety. Geier v. American Honda Motor Co., 529 U.S. 861, 871 (2000). [6]

The Act does contain a savings clause for common law tort claims.[7] The savings clause, however, was written with the personal injury tort suit in mind. A plaintiff's victory in such a suit does not compel the adoption of a safety standard or require the jury to redesign important car systems. In a personal injury suit, the jury simply awards money damages. In the instant case, however, the jury would be required to decide whether and how the seating systems could be repaired or strengthened. These factors, in combination, strongly counsel against class certification.

---

[6] As discussed above, a jury verdict in the Class's favor would not necessarily set a new nationwide seatback rigidity standard. It would apply to only one seating configuration in vehicles that are no longer being manufactured. Nevertheless, one cannot foretell the collateral estoppel effect of a class verdict that, by special interrogatory, must necessarily specify a rigidity requirement. Fear of the possible preclusive effects of a class judgment, and other considerations, might well unnecessarily pressure all manufacturers to redesign future cars to meet the standard set by the jury.

[7] Compliance with a federal standard "does not exempt a person from liability at common law." 49 U.S.C. § 30103(e).

11

As mentioned in Lloyd 1, several personal injury seatback cases have gone to trial. A seatback case, therefore, is not per se an impossible task for a jury. A personal injury case is, however, tethered to the discrete facts of an identifiable accident involving specific individuals. The jury are presented with a concrete set of data that they can analyze with the aid of expert testimony. The manufacturer can, of course, defend by pointing out that it must design the seating system to perform under all conditions. At the end of the day, however, the jury need only decide whether the system should have functioned better in one particular accident.

The instant case presents a more difficult and amorphous task for the jury. Because there is no specific accident at issue, the jury must evaluate the seating system's performance in the abstract. It must take into consideration the multiplicity of accident types and passenger profiles and decide whether the existing NHTSA standard (3,300 inch-pounds) is adequate, and, if not, how rigid the seatbacks should have been to make the overall system reasonably safe. This inquiry would present overwhelming manageability problems for a jury trial. The trial would inevitably focus on what NHTSA did and did not do during the years when the agency was deciding whether to increase the rigidity standard. The Plaintiffs are effectively requesting a lay jury to undertake the same task facing NHTSA but without the benefit of NHTSA's scientific and engineering expertise or ability to conduct tests. A class action jury's daunting assignment under the risk-utility test would be further complicated by another task implicitly required by Maryland law.[8] In a personal injury case, a plaintiff need not necessarily demonstrate how the

---

[8] Maryland law would not necessarily apply to all Plaintiffs. A potential class action is further complicated by the law of lex loci delicti. Many of the class vehicles were originally purchased in states other than Maryland, either by the current or a previous owner. The question thus arises whether the injury arose at the time and place of sale or whether the injury is a continuing one.

The Plaintiffs contend that "[t]he Class Members suffer . . . financial injury where they live not where they purchased their car. Moreover, the risk of injury or death due to the Class Vehicles' seating systems occurs continually when the vehicles are driven, so this risk continually occurs in Maryland . . . ." Pls. Reply Mem. 6–7. As other courts have recognized, however, it is incorrect to state that Plaintiffs suffer ongoing injury and take this injury with them wherever they go. If Ford committed a tort by selling vehicles containing defects that cause

12

defective product could be repaired. In suits brought under Maryland's exception to the economic loss doctrine, however, the measure of damages is the reasonable cost to correct the defect. See Council of Co-Owners Atlantis Condominium, Inc. v. Whiting-Turner Contracting Co., 308 Md. 18, 35 (1986). To establish damages, therefore, the class Plaintiffs would need to show how the seatbacks could be repaired and the cost involved.

Previously, Plaintiffs estimated that the cost to repair the seats would be in the neighborhood of a few thousand dollars. This was just an estimate, however, and they presented no drawings, plans, or proposals as to how repairs could be made. At argument, Plaintiffs' counsel stated that while they would be prepared to present evidence at trial as to the actual cost of repair, repairs need not actually be made. Class members could simply be issued checks in the appropriate amount, minus expenses and attorneys' fees.

There is a fundamental flaw, however, in this approach. A recovery that does not result in a repair falls afoul of the reason why the Maryland Court of Appeals recognized an exception to the economic loss doctrine. The doctrine ordinarily precludes recovery in tort for the diminution in a product's value owing to a defect. A tort suit, therefore, may not be brought unless the alleged defect has caused an actual injury. Maryland courts have recognized an exception so that life threatening conditions can be remedied before they cause injury. Id. When the defect poses a "clear, serious, and unreasonable risk of death or personal injury," Morris v.

---

economic loss, the tort was committed at the time and place of the transaction. See In re Bridgestone/Firestone, Inc., 288 F.3d 1012, 1016 (7th Cir. 2002) (In proposed class action where class included only consumers whose loss was financial rather than physical, "[f]inancial loss . . . was suffered in the places where the vehicles and tires were purchased at excessive prices or resold at depressed prices. . . . The lex loci delicti principle points to the places of these injuries . . . .").

Thus the Court would be required to determine where each class vehicle was originally purchased and apply the law of that state. If that state did not recognize Maryland's exception to the economic loss doctrine, any Plaintiff whose vehicle was purchased there would be unable to maintain suit. Differences in state law could pose significant hurdles to a finding that class claims predominate over individual inquiries.

Osmose Wood Preserving, 340 Md. 519, 533 (1995), it is bad policy to wait until someone is actually injured before suit can be brought.

Implicit in the cases recognizing the exception is the assumption that the dangerous, defective condition would be repaired. For example, in U.S. Gypsum Co. v. Mayor and City Council of Baltimore, 336 Md. 145 (1994), the Maryland Court of Appeals allowed a claim for damages relating to asbestos removal to proceed. The court reasoned that, "[r]ather than waiting for an occupant or user of the building to develop an asbestos-related injury, we believe building owners should be encouraged to abate the hazard to protect the public." Id. at 158 (quoting St. Ltd. Ptsp. v. Carey-Canada, 486 N.W.2d 393, 398 (Minn. 1992)). The primary purpose in allowing the suit to go forward was to eliminate the risk stemming from the presence of asbestos, not simply to compensate the building's owner for the change in the value of his property.

In light of the clearly stated policy that emerges from the case law, this Court would be reluctant to approve any class settlement or recovery that failed to strengthen the seatbacks.[9] If the suit resulted in the award of a few thousand dollars to each class member, it is unlikely that the class member would use the award to repair the problem. It is much more likely that the class member would simply pocket the award. Such a result would leave in place the very risk of injury that the exception was intended to eliminate.[10]

Hence, a class verdict should result in the repair of the class vehicles. Deciding if it would be possible to strengthen the seats in a way that did not create other risks would further complicate the jury's assignment.

---

[9] The Court might allow an award of money damages if the jury determined that repairing the seating systems would be infeasible. This possibility would not, however, lessen the burden on the jury because they could not make a finding of infeasibility without considering all of the repair options.

[10] Furthermore, any class member later injured in an accident would have no recourse, having already been compensated for the defect. Neither, presumably, would someone to whom a class member later sold his or her vehicle.

In sum, the Court remains unconvinced that a class action would be either manageable or superior to other methods of adjudication. In reaching this result, the Court remains mindful of the decision of the Maryland Court of Appeals that the case could proceed. That court, however, considered the case at the motion-to-dismiss stage, and focused largely on whether the defect in question was serious enough to satisfy the exception to the economic loss doctrine. It was never called upon to undertake the searching inquiry required by Rule 23 or its state-law analogue. The Court also notes that this decision does not leave the Plaintiffs without a remedy. The Maryland Court of Appeals' ruling means that Plaintiffs may still bring individual actions for economic loss in state court.[11] Moreover, should a seatback actually fail and cause injury, the injured party will have the same cause of action in tort that has always existed at common law.

### III.  CONCLUSION

For the reasons stated herein, the Court will, by separate Order of even date, DENY Plaintiffs' Renewed Motion to Certify Class. Docket No. 288.

In light of the above analysis, it is the Court's opinion that further attempts to refine the proposed class would be fruitless. The Plaintiffs are directed, therefore, to submit a status report advising the Court of how they wish to proceed.

Dated this 16th day of June, 2011.

/s/
_____
Benson Everett Legg
United States District Judge

---

[11] The Court is, of course, cognizant that much of the complexity that has defeated the Plaintiffs' present effort to certify a class would remain if cases were brought on an individual basis. Individual actions, however, are not subject to Rule 23's requirement that the court consider the likely difficulties in managing the case.